967 A.2d 729

Jonathan G. NEWELL, et al.

v.

Susan RUNNELS, et al.

No. 48, Sept. Term, 2008.

Court of Appeals of Maryland.

March 13, 2009.

582

586

588

William F. Brockman, Deputy Solicitor Gen. (Douglas F. Gansler, Atty. Gen., Baltimore), on brief, Linda S. Woolf (K. Nichole Nesbitt, Goodell, DeVries, Leech & Dann, LLP, Baltimore), on brief for Petitioners/Cross–Respondents.

Jonathan Hodgson, County Atty., Julie T. Sweeney, Senior Asst. County Atty., Annapolis, Robert S. McCord, County Atty., Karen J. Kruger, Senior Asst. County Atty., Bel Air, John E. Beverungen, County Atty., Paul Mayhew, Asst. County Atty., Towson, George A. Nilson, City Solicitor, Sabrina Willis, Asst. Solicitor, Baltimore, Kimberly A. Millender, County Atty. for Carroll County, Westminster, John Bloxom, County Atty. for Worcester County, Snow Hill, Brief of Amici Curiae for Petitioners/Cross–Respondents—Counties of Anne Arundel, Baltimore, Harford, Carroll, Worcester and Baltimore City.

Scott G. Patterson, President, Maryland State's Attorneys' Association, Brief of Amicus Curiae, Maryland State's Attorneys' Association, in Support of Appellants.

Thomas X. Glancy, Jr. (Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore; Deborah A. Jeon, American Civil Liberties Union Foundation of Maryland, Inc., Baltimore), on brief for Respondents/Cross–Petitioners.

C. Matthew Hill, Francis D. Murnaghan, Jr., Appellate Advocacy Fellow, Brief of Public Justice Center and Maryland Employment Lawyers Association as Amici Curiae for Respondents/Cross–Petitioners.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY and JOHN C. ELDRIDGE (Retired, Specially Assigned) and ALAN M. WILNER (Retired, Specially Assigned), JJ.

HARRELL, Judge.

### Concerning the Secretaries of Princes

The choice of servants is of no little importance to a prince, and they are good or not according to the discrimination of

the prince. And the first opinion which one forms of a prince, and of his understanding, is by observing the men he has around him; and when they are capable and faithful he may always be considered wise, because he has known how to recognize the capable and to keep them faithful. But when they are otherwise one cannot form a good opinion of him, for the prime error which he made was in choosing them.

NICCOLO MACHIAVELLI, THE PRINCE 103 (W.K. Marriott trans., Borders Classics 2006) (1532).

The words of Machiavelli, a government servant who, following a regime change in his city, found himself placed on the rack because the new administration suspected he supported the outgoing administration, seem apt to the present occasion, more than a half of a millennium after they were written: is the populace's faith in a public official often determined by the successes and failures of those who formulate and implement policy on behalf of the official? Springing from the 2002 election of Jonathan G. Newell to the office of State's Attorney for Caroline County, Maryland, the present case bears on the rub which occurs when government employees, after throwing their support behind an incumbent public official who ultimately is ousted by the electorate, seek to retain their positions under the new administration. We here consider what has changed since Machiavelli's time.

In January 2000, Robert Greenleaf was appointed *ad interim* State's Attorney, following the retirement of Christopher J. Jensen, who served as the elected State's Attorney from 1986 to 2000. Greenleaf decided to run for the position in the 2002 election and secured the Democratic nomination; however, his Republican challenger, Newell, defeated him in the General Election.

Five weeks after his victory, Newell held a meeting with three of the ten existing employees of the State's Attorney's Office (the "SAO"), at which he informed them that their employment would be terminated when he took office. Newell kept his word, firing all three upon assuming office in January

2003. Two of the discharged employees, Susan Runnels and Marjorie Cooper (collectively the "Plaintiffs"),[1] brought suit in the Circuit Court for Worcester County[2] against Newell and the State of Maryland (collectively the "State Defendants"), as well as the County Commissioners for Caroline County (the "County"), alleging that their firings were unconstitutional because they were based on the employees having campaigned on behalf of Greenleaf in his unsuccessful bid for office. They sought reinstatement and back pay. They also asked for back pay for overtime hours for which they claimed they were not properly compensated before the firings.

### Relevant Factual Background[3]

#### *Susan Runnels*

In 2000, *ad interim* State's Attorney Greenleaf hired Susan Runnels as a Victim Witness Coordinator ("VWC") in the SAO. Apparently, Runnels excelled in her job; she received a performance bonus from the Caroline County government in 2001 and was named "outstanding employee of the year" for the SAO for 2002. According to the County government's job description for the VWC position, Runnels performed "clerical work" for assistant prosecutors and acted as a liaison between them and the victims and witnesses in the cases they prosecuted. Specifically, she helped prepare criminal informations and witness subpoenas. She also scheduled meetings between the prosecutors and the victims and witnesses, telephoned witnesses to confirm their court attendance and advise them of postponements, and called witnesses into the courtroom for

---

**1.** The third employee, an Assistant State's Attorney, is not a party to this litigation.

**2.** Their complaint was filed initially in the Circuit Court for Caroline County, but removed ultimately to the Circuit Court for Worcester County.

**3.** The factual background supplied in this opinion comes from the well-pleaded averments of the complaint, other pleadings and papers (and appended documents), and discovery. Because the trial court disposed of the matter through summary judgment, we relate the factual background with the appropriate appellate standard of review in mind.

their testimony during trials. As a VWC, Runnels's direct superior, according to the SAO's formal hierarchy, was the Office's Administrative Coordinator; however, her activities in practice were supervised by the assistant prosecutors handling the cases to which she was assigned. She was earning $11.30 per hour at the time of the firing at issue.

Although it was not a formal part of her job duties as a VWC, Runnels volunteered to serve on a "Hot Spots" committee, a crime-prevention coalition in Caroline County. The committee included the Mayor of the Town of Federalsburg, the Deputy State's Attorney, and members of the local law enforcement and social services professions. Runnels was responsible primarily for note-taking during the committee's meetings.

### Marjorie Cooper

In 1987, Jensen, then the elected head of the SAO, hired Marjorie Cooper as the SAO's first VWC. During her time in that position, Cooper trained later-hired VWCs, including Runnels. She claimed that she and the Office's prosecutors worked with the State Attorney General's Office and VWCs from other counties to develop the contours of the VWC position at the SAO; she considered her contribution to that effort to be "important." Jensen stated that Cooper worked with the prosecutors and staff in developing "streamlined methods of handling larger volumes of cases." Cooper consistently performed well as a VWC, generally receiving good evaluations from her superiors. Indeed, Jensen recollected that she received an award for her service.

In 2001, *ad interim* State's Attorney Greenleaf promoted Cooper to the position of Senior District Court Coordinator. In her new position, Cooper's direct superior was the Office's Administrative Coordinator. The Administrative Coordinator reported to the Deputy State's Attorney, who, in turn, reported to the State's Attorney. Cooper's duties as Senior District Court Coordinator included: pulling case files; subpoenaing witnesses; filing; and performing similar clerical tasks to aide assistant prosecutors in handling their cases. She also contin-

ued to perform VWC duties for juvenile cases and filled-in for other VWCs when they were absent; however, she had much less contact with victims and witnesses then she did before becoming Senior District Court Coordinator. Cooper was earning $14.58 per hour at the time she was fired.

### The Victim Witness Coordinator Position

Throughout this litigation, the nature of the VWC position in the SAO was contested ardently. On one hand, the State Defendants contend that, as a VWC, Runnels held a unique position of trust and confidence, which justified Newell in dismissing her for campaigning on behalf of his General Election opponent. Although Cooper was no longer officially a VWC, she often continued to serve in that capacity, and thus, according to the State Defendants, Newell was justified also in dismissing her for campaigning against his election. The Plaintiffs, on the other hand, assert that their job duties were predominantly clerical and, therefore, did not permit for Newell's actions under the circumstances.

The official job classification for the VWC position with the SAO provides:

> This [position] is clerical work at the experienced level. An incumbent in this class, with general supervision from the State's Attorney, coordinates appearances of victims and witnesses at trials and performs certain clerical work as directed. Assignments are stable in nature and are carried out in accordance with established precedents and well-defined policies. An employee in this class is permitted flexibility and the exercising of some independent judgment in carrying out the assigned staff responsibilities. Contact with others is an important part of the job, requiring the employee to be tactful and discreet to obtain cooperation. Work is checked initially on an ongoing basis. Once the employee has been thoroughly trained, work is spot checked to assure compliance with standards.[4]

---

4. Although the VWC position describes an employee of the SAO, the official job classification reads, "Caroline County Class Specifications."

Applicants for the VWC position supposedly were to possess the minimum attributes of a high school diploma (or GED) and two years of office experience, preferably "with an agency dealing with the administration of justice." Neither Runnels nor Cooper possessed the required office experience when initially hired to work for the SAO.

At his deposition taken in this case, Jensen testified that, during his tenure, the job of a VWC was "to better facilitate the victims' knowledge of the ... day-to-day details of the case that ... the attorneys were either not involved with themselves, such as scheduling and that sort of thing, or didn't have time to communicate." Jensen also stated that VWCs contacted witnesses to ensure that they received their subpoenas and were aware of their court dates. According to him, if witnesses or victims had questions "beyond administrative questions," VWCs communicated those questions to the assigned prosecutors; however, the record, from what we can discern, does not reflect who responded back to the victims and witnesses with answers. Jensen characterized the position of VWC as one of trust, noting further that he believed the purposes of the position included "enhanc[ing] communications between the public and the S[AO]" and "communicating to the public the philosophy ... of the prosecutor"; however, he did not consider VWCs to be policymakers in the scheme of the SAO's operation.

Greenleaf testified that VWCs often spoke with victims and witnesses outside the presence of the prosecutors. He did not believe Plaintiffs held positions of trust within the SAO; however, he said he needed to have faith in them. In that regard, he elaborated that "I expected people to do their jobs and to do them correctly and efficiently. It didn't matter whether I trusted them or not ... I wanted to see if they did their job." Both Greenleaf and Jensen said they thought of VWCs as "public face[s]" of the SAO.

For their part, Plaintiffs characterized their job duties as clerical support for the prosecutors. Indeed, Runnels claimed that, when she was absent, the receptionist typically filled-in

for her as a VWC. Yet, Plaintiffs also conceived their positions as ones of trust and believed they were "at-will" employees. Neither, however, played a role in deciding who to charge in a case or in formulating prosecutorial strategy. They were not permitted to give legal advice to victims or witnesses, and they averred that they did not act as spokespersons for the SAO with the news media or general public. Both acknowledged that they sometimes explained to victims and witnesses legal concepts, including such things as restitution, probation before judgment, spousal privilege, and the privilege against self-incrimination; however, the record does not reflect whether their explanations were limited to rote definitions, involved individualized factual assessments, or fell somewhere in-between. Runnels recalled that, often, she was unable to answer the questions of victims and witnesses and had to refer the victims and witnesses to attorneys. Plaintiffs also acknowledged that they helped victims prepare "victim impact statements," but the record does not reveal how substantive was this guidance.

VWC duties in the SAO changed after Plaintiffs' employment ended. Newell explained at his deposition that he "rearranged the positions somewhat" by requiring assistant prosecutors to shoulder more interaction with victims and witnesses.

### The 2002 Campaign and Election

Plaintiffs actively supported *ad interim* State's Attorney Greenleaf's campaign to become the elected State's Attorney for Caroline County. Although a registered Republican, Runnels volunteered as his campaign manager and treasurer. She distributed campaign materials and placed a Greenleaf sign in her yard and a Greenleaf bumper sticker on her car. On election day, she distributed Greenleaf literature at a polling place.[5] Cooper, a Democrat, did not occupy an official position with the Greenleaf campaign, but she was an outspoken

---

5. The State Defendants include within the appendix to their brief a letter purportedly written by Runnels to the editor of a local newspaper, extolling Greenleaf as a "pro" and deriding Newell as a "rookie."

supporter. She placed a sign in her yard, wrote a supportive letter to the editor of a local newspaper, and distributed his political literature on election day. The Plaintiffs wore Greenleaf buttons at work (until a local judge directed them to stop), and there was testimony suggesting that they campaigned for Greenleaf at work.

During the election season, Newell was serving as the Deputy State's Attorney for Kent County, Maryland; however, he knew Runnels and Cooper previously because he worked as an Assistant Public Defender in Caroline County until early 2001 and had opportunities to interact with them. Newell stated in his deposition that his problems with Plaintiffs resulted from his professional experience with them while an Assistant Public Defender and had little to do with their support for Greenleaf; however, he admitted that he never complained contemporaneously to anyone in the SAO about Plaintiffs' conduct in this regard. Newell perceived that Plaintiffs often were disrespectful to him and his clients. He also claimed that occasionally he overheard Runnels make comments to members of the public, such as "don't ask me, that's not my job description" and "don't ask me, I only work here." He believed Runnels misinformed domestic violence victims that they were required to testify against their spouses. Cooper, Newell recalled, routinely neglected to issue subpoenas, resulting in unnecessary postponements and prompting many complaints from law enforcement officers. He also said that she often appeared to be "coming and going [from work] when she wanted to" and that he sometimes heard her using profanity.

Newell asserted that his opinions of Plaintiffs were echoed by others who encountered the SAO and, accordingly, he campaigned on a platform of "change." Indeed, he told supporters at a fundraiser that he intended to "make some major changes in the office." Others, however, contradicted

---

Neither the State Defendants nor their supporting *Amici,* however, point to a citation in the record for this letter. Plaintiffs assert the letter is not part of the record before the Court. We could not find it in the record. Accordingly, we do not consider it.

this, recollecting that he stated on the campaign trail that he did not intend to make staffing changes, if elected. Moreover, according to Federalsburg Police Chief Donald Nagel (Runnels's son-in-law) Newell was agitated by Runnels's overt support for Greenleaf during the campaign. Chief Nagel made an affidavit in this case stating that Newell repeatedly commented to him that, considering Greenleaf might lose the election, Runnels "must not like her job very much."

Newell defeated Greenleaf on 5 November 2002. He declined Greenleaf's request for a meeting to discuss the continued employment of SAO staff. Runnels called Newell to congratulate him and explain that she supported Greenleaf out of a sense of loyalty to the SAO, but would be just as loyal to him when he took office.

After his election victory, Newell met with Charles Cawley, the Caroline County Administrator, to discuss budget issues. At that time, he informed Cawley of his intention to fire Plaintiffs. Cawley suggested to Newell that he "give it some time before ... mak[ing] his decision[ ] and ... evaluate [Plaintiffs'] work performance[s]"; however, Cawley testified that he did not press the issue further because Newell appeared to have made up his mind. In December 2002, Newell met with Plaintiffs and an Assistant State's Attorney, who he believed was loyal to Greenleaf, and informed them that they would be terminated when his term of office began in January. Newell explained that their terminations were not because of poor performance and none of them were in any way at fault. This prompted Runnels to inquire of him whether his decision was based on their having campaigned for Greenleaf, to which Newell reportedly replied "absolutely not," in a tone that Runnels characterized as sarcastic. Newell told Runnels that she should have known that, when Greenleaf lost, she would not retain her job.[6]

Plaintiffs' employment with the SAO ended officially on 6 January 2003. Newell maintained that he fired the Plaintiffs

---

6. Newell retained Greenleaf's other employees during his transition; however, by six months into his term, only three remained. Two more

because he could not trust them. Among the many reasons for that distrust, he noted that he believed Plaintiffs would "continue to be loyal to Greenleaf"; however, he clarified that he did not fear that they would campaign for Greenleaf if Greenleaf chose to run again. Instead, he claimed to be "more concerned that they would undermine what [he] needed to do in [his] office [ ] and leak out information and spread falsehoods, et cetera." When asked at his deposition why he retained other employees when he assumed office, Newell responded:

> I really didn't trust any of them. I was willing to try to trust a few of them to see how it worked out, because, frankly, otherwise I would have been by myself in an empty office with the phones ringing and me not knowing where the paper clips are.

> So, I sort of had to take a chance with some of them. I chose those who I didn't have any reason to believe [ ] had work ethic issues, and that's what I did. . . .

*County Control Over Plaintiffs' Work and Compensation*

Plaintiffs alleged that, before their firing, they were required frequently to work more than 40 hours per week, but were not compensated with overtime pay for their services. Although they worked for the State's Attorney, a State official,[7] Plaintiffs were paid by the County. Plaintiffs, like other employees of the SAO, were enrolled in the County's benefits program for County employees. The County allocated a line item for overtime pay in the SAO's budget.

Plaintiffs attested that internal SAO policy directed them to maintain separate records reflecting their work hours: on

---

left in December 2004, and, by May 2005, the SAO contained no employees from Greenleaf's administration.

**7.** The Maryland Constitution provides, in relevant part, "[t]here shall be an Attorney for the State in each county and the City of Baltimore, to be styled 'The State's Attorney', who shall be elected by the voters thereof, respectively, and shall hold office for four years. . . ." Maryland Code (2003 Repl.Vol.), Constitutions Article V, § 7.

"time cards," they recorded that they worked eight hours each day, whether true or not; and on "comp sheets," they recorded the number of hours, in excess of eight, that they worked each day. They turned their "time cards" into the SAO's Administrative Coordinator, who in turn submitted them to the County. The County relied on the "time cards" to pay SAO staff. The "comp sheets," however, served as a tool, within the SAO, to allow staff members that worked longer than the eight hour workday to exchange the extra hours at a later time without reporting on their "time cards" that they worked less than eight hours on the day that they used their comp-time. Plaintiffs did not object contemporaneously to anyone about receiving comp-time in lieu of overtime pay. According to *ad interim* State's Attorney Greenleaf, he structured this dual time-keeping scheme because the County informed him that overtime pay could not exceed the dollar amount reflected on the SAO budget for that line item. He inherited the dual time-keeping system from his predecessor, Jensen, who stated that the County told him that he had no choice but to use compensatory time, instead of paying his staff for overtime. In February 2001, however, Greenleaf modified Jensen's policy of awarding comp-time at a rate of "time and a half," dictating instead that SAO staff be awarded comp-time on a "time for time" basis.[8] For his part, Greenleaf maintained that he changed the comp-time policy at the behest of Cawley, the County Administrator, following a specific incident in which, according to Greenleaf, Cawley approved overtime pay for Cooper, but later changed his mind and asked the SAO to return the funds to the County.

Evidence was advanced in this litigation that suggested that the County might have had some knowledge that SAO staff members worked in excess of 40 hours per week without

---

**8.** As noted by the trial court, "[c]ompensatory time at a 'time for time' rate refers to an individual receiving compensatory time off for an equal amount of overtime worked. A 'time and a half' rate refers to an individual receiving either time off or pay, for their overtime work, at one and a half times their normal rate."

receiving overtime pay. Greenleaf stated that he maintained the comp-time policy in accordance with Cawley's wishes. The County was aware of the SAO's budgeting needs and increasing caseload. Jensen and Greenleaf both claimed that they repeatedly asked for more money to fund overtime. Cooper informed the County of her accumulated comp-time when she left the SAO earlier on maternity leave and, so she stated, occasionally discussed the SAO's comp-time policy with someone in the County's accounting and billing office. Runnels asserted that, when Newell fired her, she inquired of the County about cashing-out her accumulated comp-time and was told that was not possible because it was a "use or lose" proposition. She also said that the individual she spoke with did not seem surprised that she had accumulated so much comp-time. The County, however, never saw the "comp sheets" maintained within the SAO.

County responsibility for the SAO was not limited to paying the salaries and benefits of SAO staff and deciding the SAO's budget. Newly hired SAO staff underwent "orientation" at the County Administrator's Office. Jensen, during his tenure as State's Attorney, attended the meetings of County government department heads. He also indicated that he was obliged to get the County's permission to hire new employees, even if doing so would not have caused an increase in an existing budget allocation; he further maintained that the SAO had to follow the County's personnel "handbook" when hiring new employees. Although Cooper and Jensen collaborated to develop the parameters of the VWC position in the SAO, an employment consultant hired by the County classified the position for salary purposes. When it came to firing staff members, Jensen recalled that his actions in that regard were subject to review by the County before they became effective. On one occasion, the County allegedly stripped Greenleaf of his right to hire a secretary for the Drug Task Force program, a coalition of representatives from the SAO, the Sheriff's Office, the State Police, and the Caroline County Police.[9] He

---

9. It is not apparent how hiring for a position serving solely a coalition of State and local agencies fell within the powers of the State's

asked the County to rescind the offer it made to a candidate it had selected for the position; the County refused. Greenleaf also recounted that effectively the County fired a SAO investigator, without SAO approval, by eliminating funding for the position. According to Greenleaf, the County also took the position that the "the local police agency" should handle SAO investigations.[10]

Although the parties to this litigation agree that, in July 2000, the County enacted an ordinance explicitly providing that the SAO staff are not to be deemed County employees, they disagree as to the law's effect. Plaintiffs contend that the law changed nothing in terms of County control over SAO operations. They point to one event in particular to bolster their view. When Runnels learned that she would be fired, she decided to use some of her administrative leave time. Upon her return, she discovered that the County had removed her computer and rerouted her telephone line to another SAO employee. The catalyst for the County's action, according to Cawley, was the outgoing voice-mail message that Runnels left for callers. Cawley considered the message inappropriate for a "county-owned line," and, on his own initiative and without permission from anyone at the SAO, ordered Runnels's phone line rerouted and her computer's hard drive searched by the County's Information Technology department. He believed he did not need SAO approval to do so. Cawley explained that it appeared Runnels deleted files from her computer; however, he said that, when he spoke with her, she had "a satisfactory explanation." Runnels elaborated on the incident, testifying that Cawley informed her that, had she not provided him with a good explanation, he would have terminated her as "not in good standing with the *County*."

---

Attorney; however, we accept that it did for purposes of this case in the posture in which it reaches us.

**10.** It is not clear whether Greenleaf's reference here was to the Caroline County Sheriff's Department, the Federalsburg Police Department, or another municipal law enforcement agency.

On another occasion, Cawley refused to allow Greenleaf to implement a scheduling policy in the SAO that would have allowed SAO employees to choose what hours they wanted to work as long as they put in a total of 40 hours per week and they completed all of their assigned work. Greenleaf recalled that Cawley vetoed the idea because it would not have reflected the specific hours worked in a given day.

### *Proceedings Below*

In December 2003, Plaintiffs filed, in the Circuit Court for Caroline County, a complaint against the State Defendants and the County. The case was removed to the Circuit Court for Worcester County as noted earlier. The first three counts of Plaintiffs' complaint advanced their overarching claim that they lost their jobs because they campaigned on behalf of Greenleaf. In Count I, they asserted a First Amendment violation under 42 U.S.C. § 1983; in Count II, they asserted a companion State constitutional claim; [11] and, in Count III, they asserted a common law claim of abusive discharge based on Newell's firing them for engaging in protected political speech.[12] Supporting their abusive discharge claim, Plaintiffs pointed to provisions of the State Personnel and Pensions Article and Article 24 of the Maryland Code, which grant public employees a statutory right to engage in political activity.[13] Counts IV through VI of the complaint explicated

---

11. Article 40 of the Maryland Declaration of Rights provides "[t]hat the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." We interpret the protections of Article 40 as generally "co-extensive" with the protections of the First Amendment. *Jakanna Woodworks, Inc. v. Montgomery County,* 344 Md. 584, 595, 689 A.2d 65, 70 (1997); *see also Freedman v. State,* 233 Md. 498, 505, 197 A.2d 232, 235 (1964) (noting that "Art[icle] 40 has been treated by this Court as in *pari materia* with the First Amendment"), *rev'd on other grounds,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

12. We consider Count III as a common law claim of abusive discharge.

13. *See* Maryland Code (2004 Repl.Vol.), State Personnel and Pensions Article, § 2–304 (applicable to State employees); Maryland Code (1957,

Plaintiffs' allegation that they were not compensated properly for overtime work.[14]

The Circuit Court for Worcester County awarded summary judgment to the State Defendants and the County on all counts. Specifically, the court found summary judgment appropriate for the State Defendants on Counts I and II because, it reasoned, Plaintiffs' overt political support for Greenleaf provided Newell with an adequate justification for firing them. The court considered the application of two possible analytical tests for the circumstances: (1) the *Pickering* test, from *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), which governs cases where a government employee claims to have been fired for engaging in protected speech or expressive conduct, and which requires courts to balance the government's interest in regulating the workplace against the employee's interest in exercising her or his right to free speech; and (2) the *Elrod/Branti* test, from *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), which governs cases where a government employee claims to have been fired for political patronage reasons, and which categorically allows the government to fire certain policymaking employees because of their political party affiliation. The trial court observed that, under the *Pickering* test, Plaintiffs' right to campaign for Greenleaf did not have to yield to Newell's right to run an efficient workplace because Newell had no reason to believe that "services of the SAO were in any way affected by Plaintiffs' " campaigning for Greenleaf. But, the court nonetheless awarded summary judgment to the State Defendants because it resolved that the

2005 Repl.Vol.), Article 24, § 13–103 (applicable to employees of local governments). The relevant statutory provisions are substantively the same today as in December 2003 when the Plaintiffs filed suit.

**14.** Plaintiffs' complaint also included a separate count of breach of contract, in which they alleged that their firings did not follow the proper procedures for discharging merit employees. The Circuit Court awarded summary judgment to the State Defendants and the County on this count, and Plaintiffs did not press the matter further here.

*Elrod/Branti* test was the more appropriate test to be applied under the circumstances. To that end, the court reasoned that Plaintiffs' employment positions made them the "public face[s] of the SAO" and required them to exercise "confidentiality and discretion in implementing policy." The court also reasoned that campaign activity is a proxy for political party affiliation, which allowed Newell to dismiss Plaintiffs for campaigning against him, just as he could have dismissed them for being members of a different political party.[15]

Alternatively, the Circuit Court concluded that summary judgment was appropriate in favor of Newell, in his individual capacity. According to the court, he enjoyed Federal qualified immunity from the Count I claim. With respect to Count II, the court determined that Newell enjoyed State personnel immunity pursuant to the Maryland Tort Claims Act (the "MTCA").[16]

Regarding Count III's abusive discharge claim, the Circuit Court concluded that Maryland does not recognize this cause of action on the basis asserted by Plaintiffs, namely the right to participate in political activity.

The court found appropriate granting summary judgment on Counts I through III in favor of the County, concluding that Newell is a State official and Plaintiffs failed to show any reason why his actions should be imputed to the County, even if one assumed those actions to be unlawful.

With respect to Counts IV through VI, which effectively were claims under the Federal Fair Labor Standards Act (the "FLSA")[17] and the Maryland Wage and Hour Law (the

---

**15.** Newell is a Republican. Cooper is a Democrat. Runnels is a Republican. The State Defendants do not argue that party affiliation played a role in Newell's decision to fire Plaintiffs.

**16.** Maryland Code (1984, 2004 Repl.Vol., 2008 Supp.), State Government Article, §§ 12–101 *et seq.* The relevant MTCA provisions remain substantively the same today as when Plaintiffs initiated this action in December 2003.

**17.** *29 U.S.C.A.* § 207 (1998).

"MWHL"),[18] the court found summary judgment appropriate for the State Defendants because the State did not cede its sovereign immunity from the FLSA claim and was not defined as an "employer" for liability purposes under the MWHL. The court found summary judgment appropriate for the County, concluding that Plaintiffs were State employees and had not produced any facts or other admissible evidence suggesting that the County was their joint employer. Alternatively, the court concluded that Plaintiffs failed to advance a *prima facie* showing that the County knew of their overtime work.

Plaintiffs filed a timely appeal to the Court of Special Appeals, which, in a reported opinion, reversed in part and affirmed in part the judgment of the Circuit Court. *Runnels v. Newell,* 179 Md.App. 168, 944 A.2d 1183 (2008). Relying on *O'Leary v. Shipley,* 313 Md. 189, 545 A.2d 17 (1988), the Court of Special Appeals held that the trial court erred by applying the *Elrod/Branti* test and, therefore, should not have awarded summary judgment to the State Defendants on Counts I and II. The intermediate appellate court considered *O'Leary,* which applied the *Pickering* test, dispositive on the issue of what test applies to an employee discharge claim based on retribution for political campaign activity. The court also held that a jury question existed as to whether qualified immunity protected Newell from the Count I claim, reasoning that a jury might conclude that he should have known that the First Amendment forbade firing the Plaintiffs. Likewise, it held that a jury question existed as to whether State personnel immunity protected Newell from Count II, reasoning that a jury might conclude that Newell acted with malice or gross negligence in firing the Plaintiffs. The intermediate appellate court, however, affirmed the Circuit Court's award of summary judgment to the State Defendants on Count III, noting that Count III essentially was a rehashing of Counts I and II. Plaintiffs did not challenge in their appeal the Circuit Court's

---

18. Maryland Code (1991, 2008 Repl.Vol.), Labor & Employment Article, § 3–415. The relevant MWHL provisions remain substantively the same today as in December 2003 when this action was initiated.

award of summary judgment to the State Defendants on the FLSA and MWHL claims. Accordingly, the Court of Special Appeals did not address those claims.

Regarding the County, the Court of Special Appeals affirmed the Circuit Court's award of summary judgment to the County on Counts I through III, on the basis that Plaintiffs did not adduce a sufficient evidentiary predicate to extend liability to the County; however, it reversed the Circuit Court's award of summary judgment to the County on the FLSA and the MWHL claims, concluding that, if believed, sufficient facts were alleged from which a trier of fact could find that the County was a joint employer of Plaintiffs and knew of their overtime work.

The State Defendants, the County, and Plaintiffs all sought writs of certiorari from this Court to address their respective dissatisfaction with the judgment of the intermediate appellate court. We granted all of the petitions to consider the following questions, which we have rephrased:

I. Was Newell authorized, by the First Amendment and its State Constitution counterpart, to discharge Plaintiffs solely for campaigning for his opponent?

II. When he fired Plaintiffs, did Newell violate their clearly established First Amendment rights, such that he may be held liable, in his individual capacity, under 42 U.S.C.A. § 1983?

III. Did Plaintiffs generate a triable issue as to whether Newell acted with malice or gross negligence when he fired them, such that he, in his individual capacity, could be held liable to them under the MTCA?

IV. Does the dismissal of a government employee for exercising her or his statutory right to engage freely in political activity constitute an actionable abusive discharge distinct from the employee's constitutional claims?

V. Did Plaintiffs generate a triable issue as to whether the County, for purposes of imposing liability on the County

under Federal and State overtime laws, was their joint employer?

VI. Even if the County was the joint employer of Plaintiffs, did Plaintiffs generate a triable issue as to whether the County, for purposes of imposing liability on the County under Federal and State overtime laws, had actual or constructive knowledge of their overtime work?

*Newell v. Runnels*, 405 Md. 290, 950 A.2d 828 (2008).[19] The Maryland State's Attorneys' Association filed a brief as *Amicus Curiae* in support of Newell. Several counties submitted an *Amicus* brief in support of the County. The Public Justice Center and the Maryland Employment Lawyers Association submitted an *Amicus* brief in support of Plaintiffs.

For the reasons that follow, we affirm in part and reverse in part the judgment of the intermediate appellate court.

### Standard of Review

Maryland Rule 2–501 provides, in relevant part:

(a) **Motion.** Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.

▮ We construe the factual record in the light most favorable to the non-movants. *Gourdine v. Crews*, 405 Md. 722, 735, 955 A.2d 769, 777 (2008); *Am. Powerlifting Ass'n v. Cotillo*, 401 Md. 658, 668, 934 A.2d 27, 34 (2007);. We do not endeavor to resolve factual disputes, but merely determine whether they exist and "'are sufficiently material to be tried.'" *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 534, 836 A.2d 655, 670 (2003) (quoting *Taylor v. NationsBank*, 365 Md. 166, 173, 776 A.2d 645, 650 (2001)). "Where a dispute

---

**19.** The Plaintiffs did not challenge in this Court the intermediate appellate court's affirmance of summary judgment for the County on Counts I through III on the alternative basis that Plaintiffs did not present sufficient evidence to justify imputing liability to the County for Newell's alleged wrongdoing.

regarding a fact can have no impact on the outcome of the case, it is not a dispute of material fact such that it can prevent a grant of summary judgment." *Am. Powerlifting Ass'n,* 401 Md. at 668, 934 A.2d at 34. If no material facts are in dispute, we determine whether the trial judge's ruling was legally correct. *Gourdine,* 405 Md. at 735, 955 A.2d at 777. Ordinarily, we may affirm the trial court " 'only [on] the grounds upon which the trial court relied in granting summary judgment.' " *Id.* at 736, 955 A.2d at 778 (quoting *Rodriguez v. Clarke,* 400 Md. 39, 70, 926 A.2d 736, 754 (2007)).

### Analysis

#### I.

■ The first issue is whether there was presented a triable claim as to whether Newell's firing of Plaintiffs violated their rights under the First Amendment and Article 40 of the Maryland Declaration of Rights. The protections accorded by Article 40 are generally "coextensive" with the protections accorded by the First Amendment. *Jakanna Woodworks, Inc. v. Montgomery County,* 344 Md. 584, 595, 689 A.2d 65, 70 (1997). The Circuit Court awarded summary judgment to the State Defendants on Counts I and II, concluding, on the perception that there were no undisputed material facts, that Plaintiffs' constitutional freedoms were not violated. The intermediate appellate court reversed. *Runnels,* 179 Md.App. at 206, 944 A.2d at 1206. For the reasons that follow, we hold that the Circuit Court improperly relied on the *Elrod/Branti* test in awarding summary judgment to the State Defendants on Counts I and II because disputed issues of material fact preclude summary judgment on that basis. The Circuit Court's analysis under the *Pickering* test also was flawed, such that we cannot conclude, as the Circuit Court did, that the balancing, if applicable, favors Plaintiffs.

■ Although the government stands in a different position when dealing with its employees than it does when dealing with other citizens, a government employer, generally, may not fire or demote an employee based on the employee's

exercise of her or his First Amendment freedoms. *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 716, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). This holds true even if the employee is an "at-will" employee, serving at the pleasure of the government employer and who otherwise could "be fired for no reason whatever." *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 283, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also DeBleecker v. Montgomery County,* 292 Md. 498, 506, 438 A.2d 1348, 1353 (1982). Nevertheless, the First Amendment has been construed to allow for a public employee's rights as a citizen to yield to the government's rights as an employer, if the government can demonstrate that the interest advanced by its assailed employment action is "of vital importance" to its operations. *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). " 'To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.' " *Connick v. Myers,* 461 U.S. 138, 151, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). Yet, "the restrictions it imposes must be directed at speech that has some potential to affect [its] operations." *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951.

The parties in the present case, we note, disagree about the true reasons Newell fired Plaintiffs. The State Defendants maintain that his decision was supported by a panoply of instances in which he observed them performing poorly their job duties. Plaintiffs deny such misconduct and claim he was motivated entirely by their overt support for Greenleaf's candidacy. This is a factual dispute which we (and the Circuit Court) may not resolve in the procedural posture in which this case reaches us.

The State Defendants contend that Newell's decision was justified, even if based solely on Plaintiffs' overt support for Greenleaf. Plaintiffs' rejoin that campaign activity, by itself, is not a constitutionally valid basis for firing a public employee. Instead, they assert that determining whether Newell

acted lawfully requires a balancing of interests: their right to speak as citizens on a matter of public concern against his right as an employer to run an efficient, successful office. Plaintiffs further argue that this balancing test favors them as a matter of law, thereby generating a jury question as to whether Newell in fact terminated them for campaigning for Greenleaf, as they claim, or for other reasons not implicating constitutional concerns. Both sides rely on decisions of various U.S. Courts of Appeal, which they claim support their respective positions. We think it appropriate first to review the relevant U.S. Supreme Court cases and those of this Court that form the framework for resolving employment discharge claims against the government implicating the First Amendment.

As we observed in *O'Leary v. Shipley*, 313 Md. 189, 545 A.2d 17 (1988), there are two tests used to determine whether a government employer lawfully discharged an employee for exercising her or his political rights: the *Pickering* test and the *Elrod/Branti* test. The former, which applies when the aggrieved employee was discharged allegedly for engaging in speech or expressive conduct, derives from the Supreme Court's decision in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); the latter, which applies when the employee was discharged allegedly for political patronage reasons, comes from the Supreme Court's decisions in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

In *Pickering, supra,* the Supreme Court rejected the notion that, in all cases, a government employee, "by virtue of his public employment[,] has a duty of loyalty to support his superiors." 391 U.S. at 568, 88 S.Ct. 1731. The Court held that government employees retain their right to speak as a citizens on "matters of public concern." *Id.* The Court determined that a balancing test is appropriate where that right collides with the government's right, as an employer, to maintain efficiency in the workplace. *Id.* There, a teacher was fired by the defendant school board, after writing a letter

to a local newspaper criticizing the board's allocation of financial resources. *Id.* at 566, 88 S.Ct. 1731. The Court concluded, on the facts before it, that the teacher's termination violated the First Amendment because his comments were not made to a coworker or superior and his employment relationship with the board was "not the kind of close working relationship[ ] for which it can persuasively be claimed that personal loyalty and confidence are necessary to [its] proper functioning." *Id.* at 569–70, 88 S.Ct. 1731. Thus, his letter did not threaten "discipline" or "harmony" in the workplace to a degree that outweighed his right to speak as a citizen on a matter of public concern. *Id.* at 570, 88 S.Ct. 1731. The Court also highlighted the significant value to society in allowing a teacher to speak as any citizen on the public issue of how the school board appropriated its funds, commenting that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how [school] funds should be spent." *Id.* at 572, 88 S.Ct. 1731. The Court, however, envisioned potential scenarios in which an individual's employment relationship with her or his government employer might require such "confidentiality" or be "of such a personal and intimate nature" that a different result would obtain. *Id.* at 570 n. 3, 88 S.Ct. 1731.

In *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court reaffirmed its adherence to the *Pickering* balancing test in cases where an employment decision is based on an employee's overt expressive conduct. The Court rejected the notion that an "at-will" government employee may be discharged summarily for exercising her or his constitutional right to speak on matters of public concern. *Mt. Healthy,* 429 U.S. at 283, 97 S.Ct. 568. Yet, the Court opined that, where multiple considerations play a role in the employer's decision to fire the employee, the employee should not be immune from termination simply because she or he happened to exercise that right. *Id.* at 285–86, 97 S.Ct. 568. There, the defendant school board declined to renew the contract of an untenured teacher, citing several incidents in which it believed the teacher acted unprofessional-

ly. *Id.* at 282, 97 S.Ct. 568. Among other things, the teacher was involved in a physical altercation with a colleague on one occasion and made an obscene gesture to a group of students on another. *Id.* at 281–82, 97 S.Ct. 568. He also called a local radio station to voice his dismay over a dress code that the board imposed on its teachers. *Id.* at 282, 97 S.Ct. 568. The Court held that the teacher was required to prove that his constitutionally-protected call to the radio station was a factor substantially contributing to the board's decision not to renew his contract, a burden which it said he satisfied; however, the Court held further that the board's action would be constitutional nonetheless, if the board could show, by a preponderance of the evidence, that it would have reached the same decision absent the constitutionally-protected conduct. *Id.* at 287, 97 S.Ct. 568. Accordingly, the Court remanded the case to give the board an opportunity to do so. *Id.*

Unlike the *Pickering* balancing test, the *Elrod–Branti* test may be brandished categorically either as a sword or a shield, depending on an employee's job duties; it provides non-policymaking public employees with a sword to overcome firings based on political patronage, while providing government employers with a shield to defeat such claims by policymaking employees.

In *Elrod, supra,* a plurality of the Supreme Court concluded that a government employer may not discharge an employee based on the employee's political affiliation, unless the employee is in a "policy making position." 427 U.S. at 367, 96 S.Ct. 2673. There, the defendant sheriff was a Democrat, elected to replace a Republican. *Id.* at 350, 96 S.Ct. 2673. Three "non-civil-service" employees, including the Chief Deputy of the Process Division, sued the newly elected sheriff after he fired them, claiming that the discharge was because they were Republicans. *Id.* at 351, 96 S.Ct. 2673. Writing for himself and two other justices, Justice Brennan accepted the sheriff's premise that, as an elected official, he required politically loyal employees, "to the end that representative government not be undercut by tactics obstructing the implementation of policies of [his] administration." *Id.* at 367, 96 S.Ct. 2673. Justice

Brennan concluded, however, that the sheriff's interests did not outweigh sufficiently the rights of his employees to the point of justifying "wholesale" political patronage. *Id.* "Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end [because n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Id.* The plurality opinion iterated that nothing in the First Amendment prohibits a government employer from firing an employee if it has a valid, job-related reason for doing so, for example, if the employee was insubordinate or performed poorly her or his job; however, the plurality rejected the idea that "the mere difference of political persuasion motivates poor performance," stressing that a public employee's political beliefs "may not be used as a basis for imputing" poor performance. *Id.* at 365, 96 S.Ct. 2673.

In *Branti, supra,* the Court adopted the plurality's opinion in *Elrod;* however, it elaborated on Justice Brennan's definition of "policymaker." The Court observed that labels, such as "policymaker" or "confidential," are not dispositive. *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Rather, determining whether the First Amendment permits a government employer to fire an employee based on the employee's political party affiliation depends on "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. 1287. "[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Id.* at 517, 100 S.Ct. 1287. In *Branti,* two assistant public defenders brought suit against the newly appointed county Public Defender, a Democrat, alleging that he planned to fire them because they were Republicans (although one of them changed his party affiliation to Democrat in an effort to save his job). *Id.* at 508–09, 100 S.Ct. 1287. The Court held that their party affiliations did not justify their terminations because a public defender's job duties are not

determined by political philosophy; they are determined by the needs of her or his clients. *Id.* at 519, 100 S.Ct. 1287.

In *O'Leary, supra,* this Court considered whether the *Pickering* test or the *Elrod/Branti* test governs when an elected government official of one political party fires an employee of a different party affiliation for campaigning against the official during the official's run for reelection. A deputy clerk ran and campaigned against her boss in the general election for the office of Clerk of the Circuit Court for Carroll County. *O'Leary,* 313 Md. at 190–91, 545 A.2d at 18. The deputy lost to her incumbent boss, who fired the deputy after the election. *Id.* at 191, 545 A.2d at 18. She sued, claiming that her discharge violated the First Amendment. *Id.* We held *Pickering* to be the appropriate test, reasoning that "the *Elrod–Branti* test is a narrow and somewhat rigid one ... and is aptly applied only to a set of facts that, as a threshold matter, show political patronage as the *sole motive* of discharge." *Id.* at 205, 545 A.2d at 25 (italics added). We thought it highly significant that the deputy clerk alleged that her "overt expressive conduct" was the Clerk's motivation for firing her. *Id.* at 205–06, 545 A.2d at 25.

With this framework in mind, we turn to the present case. The State Defendants argue that the Circuit Court was correct in applying the *Elrod/Branti* test and, accordingly, correct in granting their motion for summary judgment. For the *Elrod/Branti* test to apply appropriately, however, two analytical leaps must occur. First, we would have to accept that Plaintiffs were "policymakers." [20]—that is to say that they held positions in the SAO for which affiliation with the same political party as Newell was "an appropriate requirement for

---

**20.** As noted, *Branti* refined the relevant inquiry beyond an employee's status as a policymaker; however, we shall follow the practice of other courts and use the term "policymaker" in this context as a shorthand allusion to an employee in any position for which affiliation with a particular political party is an appropriate job requirement. *See, e.g., Biggs v. Best, Best & Krieger,* 189 F.3d 989, 994 n. 4 (9th Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 99 (2d Cir.1997); *Wagner v. Devine,* 122 F.3d 53, 56 n. 7 (1st Cir.1997).

the effective performance" of the positions' inherent duties. *Branti*, 445 U.S. at 518, 100 S.Ct. 1287. Second, we also would have to accept that campaign activity serves as a stand-in or proxy for political party affiliation. In that regard, the State Defendants ask us to revisit our holding in *O'Leary*, asserting that the "doctrinal landscape" has changed since the Court decided that case. They argue that the U.S. Court of Appeals for the Fourth Circuit, as well as other courts, have broadened the protection accorded government employers under the *Elrod/Branti* test beyond firings based on party affiliation to include firings based on campaign activity, thereby categorically allowing a government employer to dismiss a policymaker who campaigned against the employer in the employer's bid for office. They urge us to do the same. As we shall explain, we baulk at the edge of the chasms over which we are urged to leap to shield the State Defendants from liability at this stage of the litigation. Too many factual questions remain concerning Plaintiffs' job duties as VWCs, and, although we accept that the lawful reach of the *Elrod/Branti* test extends to all patronage dismissals (not just those based on party affiliation), we do not agree that campaign activity necessarily triggers the proper application of this test.

The question of whether a discharged public employee was a policymaker, for purposes of the *Elrod/Branti* test, is a mixed question of law and fact. *Hobler v. Brueher*, 325 F.3d 1145, 1150 (9th Cir.2003). "[D]etermining the particular duties of a position is a factual question, while determining whether those duties ultimately make that position a policymaking or confidential [position] is a question of law." *Id.* The proper test to determine if an employee was a policymaker "is not whether the label 'policymaker' or 'confidential' fits [the] particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. 1287. " '[P]olitical affiliation is an appropriate requirement when there is a rational connection between

shared ideology and job performance.'" *Nader v. Blair,* 549 F.3d 953, 959 (4th Cir.2008) (quoting *Stott v. Haworth,* 916 F.2d 134, 142 (4th Cir.1990) (quoting *Savage v. Gorski,* 850 F.2d 64, 68 (1988))). Otherwise put, it is not enough for the government to show that a public employee's position entailed policymaking, confidentiality, or the exercise of discretion; as a threshold matter, the government must show that the position related to "partisan political interests ... or concerns" *Id.* (alteration in original). That is, the position entailed "decision making on issues where there is room for political disagreement on goals or their implementation." *Id.*

 If the position related to partisan political interests, the government then must show that the inherent duties of the position made the employee "a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Id.* The U.S. Court of Appeals for the Sixth Circuit formulated a useful model for ascertaining whether a particular employee's job duties rendered her or him a policymaker in this context. According to that court, there are four categories of policymakers:

**Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

**Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

**Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential em-

ployees who control the lines of communication to category one positions, category two position[s,] or confidential advisors;

**Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Murphy v. Cockrell,* 505 F.3d 446, 453–54 (6th Cir.2007) (quoting *McCloud v. Testa,* 97 F.3d 1536, 1557 (6th Cir.1996)).

 ▮ In this case, too many questions remain concerning Plaintiffs' job duties to affirm the Circuit Court's grant of summary judgment. Arguably, they may fall into categories two or three of the *Murphy* paradigm, but that is far from clear on the present record. The State Defendants stress that Newell's predecessors referred to VWCs as "public face[s]" of the SAO. They highlight that Jensen, who hired Cooper, believed the VWC position to be one of "trust." These points, however, are merely the individual speakers' characterizations of Plaintiffs' bundle of job duties. The State Defendants do not articulate specifically what Plaintiffs did at the SAO that would compel a court to adopt those characterizations as a matter of law. *See Lopez–Quinones v. P.R. Nat'l Guard,* 526 F.3d 23, 25–26 (1st Cir.2008) (commenting that, under *Elrod/Branti,* "duties prevail over titles"); *Hobler,* 325 F.3d at 1151 (noting that a public employer cannot avoid liability under the First Amendment by simply titling an employee as "confidential staff"). Plaintiffs, if believed, did not act as spokespersons for the SAO with the news media or the general public. The record does not reflect the extent of the discretion exercised by Plaintiffs in explaining legal concepts to victims and witnesses; nor does it reflect how substantive their input was in aiding victims in composing victim impact statements. The State Defendants' position is undermined further by the fact that Plaintiffs were not allowed to give legal advice and played no role in deciding what cases to prosecute (a core function of the SAO), as well as by the job classification for the VWC position, which provides that a VWC's "[a]ssignments . . . are carried out *in accordance with*

*established precedents and well-defined policies."* (italics added).

■ We note that some "clerical" employees, depending on the nature of their duties, may be considered properly as policymakers for the sake of applying the *Elrod/Branti* test. Here, however, while testimony indicated that the Plaintiffs "communicated" non-administrative questions to assistant prosecutors on behalf of victims and witnesses, that does not mean necessarily that they "control[led] the lines of communication" at the SAO, such that they were subject to patronage dismissals. *See Faughender v. City of N. Olmsted,* 927 F.2d 909, 913 (6th Cir.1991) (allowing new mayor to fire former mayor's personal secretary for patronage reasons because position as mayor's secretary was "inherently political" and "control[led] the lines of communication" to the mayor); *see also Hobler,* 325 F.3d at 1152 (allowing newly elected prosecutor to fire personal secretaries of predecessor where one secretary was responsible for reporting confidentially to the elected prosecutor on the "performance issues" of assistant prosecutors, while the other secretary, without supervision, ran the prosecutor's child support collection office).

Attempting to amplify the significance of Plaintiffs' job duties, the State Defendants bootstrap the General Assembly's increasing attention to the rights of crime victims.[21] They point out that one of Newell's predecessors confirmed that the elected State's Attorney puts her or his "reputation" and "credibility" in the hands of VWCs, and they contend that Plaintiffs had access to confidential information, such as trial tactics. For those reasons, they assert, an elected State's Attorney must have a good working relationship with her or his VWCs. We do not doubt the role played by VWCs in the operation of a prosecutor's office. Yet, performing significant

---

**21.** The State Defendants note that victims have rights of which are to be notified and to attend court proceedings, to request restitution, and to be notified of the terms of plea agreements and outcomes of court proceedings. *See* Maryland Code (2001, 2008 Repl.Vol.), Criminal Procedure Article, § § 11–102, 11–104 & 11–603.

work is not the relevant constitutional standard; nor is it whether a position is such that an employee's ineptitude or lack of professionalism might make the public agency look bad. Rather, what is important is whether an employee's duties and performances embraced "decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Nader,* 549 F.3d at 959; *see also Carlson v. Gorecki,* 374 F.3d 461, 465–65 (7th Cir.2004) (holding that summary judgment was not appropriate for newly elected State's Attorney, who fired the office's special investigators for political patronage reasons, because there was no evidence that the investigators "handled sensitive political information"); *Dickeson v. Quarberg,* 844 F.2d 1435, 1443 n. 7 (10th Cir.1988) (noting that secretary who "undoubtedly had access to confidential information concerning law enforcement matters in criminal and civil cases" was not subject to patronage dismissal because "that information ha[d] no bearing whatsoever on partisan political concerns"). On this record, nothing suggests that whatever, if any, discretion exercised by Plaintiffs satisfies this requirement. The State Defendants rejoin that prosecutors have "precious little room for error" when dealing with victims and witnesses and, thus, poor communication between the SAO and the victims and witnesses may cause a prosecutor's case to unravel. They bolster their rejoinder by noting recent amendments to Maryland Rule 4–263, which oblige prosecutors and their staff to identify and provide to defense counsel certain information about victims and witnesses. This argument reinforces the need to have competent employees; it does not justify political patronage. "[T]he mere difference of political persuasion" does not translate to poor performance. *Elrod,* 427 U.S. at 365, 96 S.Ct. 2673; *see also Lopez–Quinones,* 526 F.3d at 27 (commenting that "[a]n ability to undermine an operation through incompetence or malfeasance does not mean the actor engaged in policymaking or was a confidante or spokesman for policymakers").

Even if the State Defendants are able to show, on remand, that Plaintiffs were policymakers, we nonetheless are

unable to conclude, as a matter of law, that the *Elrod/Branti* test would shield them from liability. In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court implicitly recognized that the termination of an assistant prosecutor by a local district attorney, based on her overt expressive conduct, triggered the *Pickering* test. There, the district attorney fired the assistant prosecutor for circulating to her coworkers a questionnaire concerning the office's internal operations, which the Court ultimately held was not a matter of public concern under *Pickering* sufficient to outweigh the district attorney's interest in deterring conduct he reasonably believed would disrupt office operations. *Connick*, 461 U.S. at 154, 103 S.Ct. 1684. We cannot conceive of a coherent basis for applying the *Pickering* test to cases in which a prosecutor is fired for expressive conduct, while allowing the firing of VWCs or other employees in the SAO categorically under *Elrod/Branti*.[22] This Court too has recognized that the termination of a government employee appearing to be a policymaker is assessed under the *Pickering* balancing test, if the termination was based on expressive conduct. *DiGrazia v. County Executive*, 288 Md. 437, 454, 418 A.2d 1191, 1201 (1980) (applying the *Pickering* test, where county executive fired county director of police for making disparaging remarks about the police force, and holding that fact issues precluded summary judgment). Accordingly, we decline to hold here that an employee's status as a policymaker gives the government the categorical right to fire the employee based on the employee's speech or conduct.

The State Defendants anticipatorily respond, however, that campaign activity should not be analyzed like speech or overt expressive conduct, it being more akin to political party affilia-

---

**22.** More recently, the Supreme Court held that a deputy district attorney did not have a protected First Amendment interest in exposing police misconduct, when he did so pursuant to his official duties as a deputy district attorney. *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. The Court's extensive analysis in that regard, however, implies that *Elrod/Branti* does not permit the categorical dismissal of a deputy district attorney, if the dismissal is based on the prosecutor's speech or expressive conduct.

tion. We agree that the proper reach of the *Elrod/Branti* test's protection for government employers extends to all patronage dismissals of policymaking employees, not just those based on party affiliation; however, the dismissal of an employee for her or his campaign activity is not a patronage dismissal necessarily.

The First Amendment allows the leeway for the categorical right to fire policymaking employees for political patronage reasons. *See Branti*, 445 U.S. at 518, 100 S.Ct. 1287; *O'Leary*, 313 Md. at 205, 545 A.2d at 25; *see also Nader*, 549 F.3d at 959; *Hobler*, 325 F.3d at 1149. Political patronage exists where a government employer "elevates political support to a job requirement." *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir.1989). As the U.S. Court of Appeals for the Third Circuit articulated:

> Members of the same party are presumed to share common interests and goals, and patronage appointments usually come from the same party as the elected official. But identical party affiliation does not necessarily ensure the subordinate's loyal adherence to the superior's policies. Primary election fights can be famously brutal, sometimes more so than contests in the general election, and animosity between candidates is likely to result.

*Curinga v. City of Clairton*, 357 F.3d 305, 311 (3d Cir.2003) (internal citation omitted).

While the warmly contested campaign for State's Attorney for Caroline County underlying this case occurred during a general election, not a primary, this unremarkable point remains salient: even within parties, there is room for considerable political disagreement. A member of the same political party as her or his employer may harbor political ideologies that conflict fundamentally with the policies adopted and implemented by the employer. *See id.* at 308 (commenting that plaintiff was an "action team" Democrat opposing the "regular" Democrats). Accordingly, a rule limiting patronage dismissals to antagonists of different party registration could undermine the will of the electorate to the same degree as a

rule prohibiting patronage dismissals outright. Be that as it may, a distinction remains between employment decisions based on political patronage and those based on an employee's exercise of free speech. *Barker v. City of Del City*, 215 F.3d 1134, 1139 (10th Cir.2000). The reach of *Elrod/Branti's* shield for a public employer, therefore, may be pierced when it intrudes into "the *content* of [an employee's] expression of political beliefs." *See Morris v. Crow*, 117 F.3d 449, 456 (11th Cir.1997) (italics added) (quoting *Terry*, 866 F.2d at 377). Stated plainly, the mere fact that an employee engaged in campaign activity does not invite application of the *Elrod/Branti* test; if the speech itself contributed to the employer's decision to fire her or him, the *Pickering* balancing test applies. Indeed, the Supreme Court observed, in *O'Hare Truck Serv., Inc. v. City of Northlake*, that "where specific instances of the employee's speech or expression . . . are intermixed with a political affiliation requirement . . ., the balancing *Pickering* mandates will be inevitable." 518 U.S. at 719, 116 S.Ct. 2353.

Accordingly, we reaffirm *O'Leary's* central holding—that the *Pickering* test applies where a discharged employee maintains that speech or expressive conduct "played a role" in the employer's decision to fire the employee. *See O'Leary*, 313 Md. at 205–06, 545 A.2d at 25. Although we now extend the meaning of political patronage beyond firings based on party affiliation to encompass all situations where a public employer elevates political support to a job requirement, the *Elrod/Branti* test continues to apply "only to a set of facts that, as a threshold matter, show political patronage as the *sole motive* of a discharge." *Id.* at 205, 545 A.2d at 25 (italics added). This rule is consistent with those of other courts which also apply the *Pickering* test to hybrid cases involving employee discharges based on elements of speech or expressive conduct and elements of political support or lack thereof. *See Jordan v. Ector County*, 516 F.3d 290, 296 (5th Cir.2008) ("[T]his court has concluded that factual scenarios in which government employers discharge employees based upon their political affiliation, their exercise of their right to free expres-

sion, or some combination thereof 'locate themselves on a spectrum' ... [which] guides the application of [ ] *Pickering* balancing."); *Curinga,* 357 F.3d at 312 (*"O'Hare* implied that *Pickering* balancing should be used when termination is motivated by both a public employee's speech and political affiliation[.]*"*).

The State Defendants predict anomalously that a different result would obtain were the present case before a federal court in Maryland because, so they proffer, the U.S. Court of Appeals for the Fourth Circuit treats campaign activity as a proxy for party affiliation for the purposes of the *Elrod/Branti* test. They rely on *Jenkins v. Medford,* 119 F.3d 1156 (4th Cir.1997) (en banc), in which a newly elected sheriff dismissed all of the deputies that campaigned for his opponent. There, the court held that deputy sheriffs could be policymakers for the purposes of the *Elrod/Branti* test. *Jenkins,* 119 F.3d at 1164. The court also recognized "that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity. Either basis is a proxy for loyalty to the sheriff." *Id.* To the extent that *Jenkins* is persuasive authority, we do not see our continued adherence to *O'Leary* as necessarily inconsistent with it, as the State Defendants contend. Indeed, *Jenkins* cited, with approval, an earlier decision of the Fourth Circuit, *Joyner v. Lancaster,* 815 F.2d 20 (4th Cir.1987), which applied the *Pickering* test in a situation where a sheriff's deputy campaigned against the incumbent sheriff. *Jenkins,* 119 F.3d at 1161 (citing *Joyner,* 815 F.2d at 22–23). *Jenkins* embraced *Joyner* for the proposition that a court should consider a deputy sheriff's "role in the sheriff's department," when analyzing a First Amendment claim of retaliatory firing. *Id.* Importantly, *Jenkins* did not hold that the *Elrod/Branti* test applies whenever a public employer fires a policymaker for her or his campaign activity. Rather, it distinguished *Joyner* on the basis that, in *Joyner,* the sheriff fired a particular deputy because the deputy's specific campaign activities were causing "friction in the department"; the sheriff in *Jenkins* fired "wholesale" the deputies that campaigned for his opponent because he "elevate[d]

political support to a job requirement." *Id.* at 1160–61.[23] Therefore, it appears that the Fourth Circuit, like this Court, recognizes a distinction between dismissals based on campaign activity where the speech itself motivated the employer and those where patronage motivated the employer.

The State Defendants also select for emphasis a decision by the U.S. Court of Appeals for the Seventh Circuit for the proposition that "[i]t would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who do their best to serve their superiors faithfully but have the misfortune to belong to the wrong party." *Wilbur v. Mahan,* 3 F.3d 214, 219 (7th Cir.1993). At its core, this is simply a variation of the argument accepted by the Supreme Court in *Mt. Healthy, supra,* but which nonetheless does not entitle the State Defendants to summary judgment on this record. In *Mt. Healthy,* the Court recognized that a public employee should not be able to engage in protected speech or conduct in order to prevent the employer from firing her or him. 429 U.S. at 286, 97 S.Ct. 568. To ensure that a fired employee not be in a better position as the "result of the exercise of constitutionally protected conduct" than the employee would have enjoyed had she or he not engaged in such conduct, the Court held that a fired employee must prove that the protected conduct substantially contributed to her or his discharge, while the government has the opportunity to prove that it would have reached the same decision even in the absence of that conduct. *Id.* at 286–87, 97 S.Ct. 568. In other words, *Mt. Healthy* allows a government employer to evade liability by proving that it would have reached the same decision on some other ground that did not run afoul of the First Amendment, such as the employee's incompetence or insubordination. Be-

---

**23.** In *Joyner,* the court held that the *Pickering* balance favored the employer, in part because the plaintiff deputy campaigned against his boss and in part because he expected his boss's challenger, if elected, to promote him. 815 F.2d at 23–24. For this reason, the campaign activity related less to a matter of public concern than to a matter of potential personal advancement. *Id.*

cause the Supreme Court, in *Elrod, supra,* and *Branti, supra,* sanctioned expressly, as not running afoul of the First Amendment, a government employer's right to discharge a policymaker for political patronage reasons, a government employer may defend its decision on that basis, as it could on the basis that the fired employee, for example, was incompetent or insubordinate.

In the present case, it is not clear yet that Newell fired Plaintiffs for reasons of political patronage, as some facts suggest that he did not elevate political loyalty to a job requirement in his administration. Indeed, Newell testified that he "really didn't trust any of [the SAO employees]," but chose to retain (for a while) those that he did not "believe [ ] had work ethic issues." Moreover, Newell offered several reasons why he fired Plaintiffs, only one of which was that they supported and campaigned for Greenleaf, and, when Runnels asked whether her campaign activity was his reason for firing her, Newell said it was not, but did so, allegedly, with sarcasm. Newell's multi-faceted approach to explaining his decision to fire Plaintiffs is susceptible to a trier of fact concluding that he did not elevate political support to a job requirement in his administration and, perhaps, fired Plaintiffs for exercising their rights to free speech. The significance of this evidence is reinforced by other evidence, if believed, tending to show that Newell campaigned on not making staff changes at the SAO.

If, on remand, it is determined that Plaintiffs were policymakers *and* the State Defendants are able to prove satisfactorily that political support was a job requirement in the Newell administration, the State Defendants may have the benefit of *Elrod/Branti's* shield; however, if the court concludes that Plaintiffs were not policymakers, proof that political support was a job requirement will not protect the State Defendants. If *Elrod/Branti* does not protect the State Defendants on remand, the *Pickering* test applies.

Although it determined that the *Elrod/Branti* test was controlling, the Circuit Court alternatively found that, if *Pick-*

*ering* governs instead, the balancing favors Plaintiffs. The Circuit Court's analysis and conclusion that, on this record, the *Pickering* balancing test favors Plaintiffs is not correct.

*Pickering* directs courts to balance a government employer's interest in maintaining harmony and efficiency in the workplace against an employee's right to speak as a citizen on "matters of public concern." 391 U.S. at 563, 88 S.Ct. 1731. As explained recently by the Supreme Court, the balancing necessarily requires a finding that the aggrieved employee spoke as a citizen, and not pursuant to her or his official duties as an agent of the public employer. *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951. The balancing also requires a court to determine whether the speech bore on a matter of public concern. *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. If the employee engaged in the controversial speech or conduct while purportedly speaking on the employer's behalf, or, if the speech did not relate to a matter of public concern, the balancing tilts in the employer's favor, ordinarily ending a court's analysis. Otherwise, a court must proceed to assess the needs of the government as an employer. To that end, what the government must demonstrate, in terms of the potential for disruption and the gravity of that disruption, depends on how substantially the employee's speech touches on a matter of public concern. *Id.* at 154, 103 S.Ct. 1684. While "[t]he ultimate determination of whether speech is constitutionally protected under [the *Pickering* test] is a question of law for the court, ... in striking the balance[,] there may be factual matters appropriate for determination by a jury." *DeBleecker,* 292 Md. at 511, 438 A.2d at 1355.

When applying the *Pickering* test, courts may consider:

(1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity

may be characterized as hostile, abusive, or insubordinate; [and] (5) whether the activity impairs discipline by superiors or harmony among coworkers.

*Jordan,* 516 F.3d at 299.[24]

■■■ Consideration of a discharged employee's role in the agency is also significant. *See DiGrazia,* 288 Md. at 450, 418 A.2d at 1199 (*"Pickering[ ]* permits consideration of whether the employee is a policymaking, as opposed to a nonpolicymaking[,] official ...."); *see also Younkers v. Prince George's County,* 333 Md. 14, 23–24, 633 A.2d 861, 865 (1993) (noting that police department's interests in maintaining discipline outweighed police sergeant's right to make comments critical of the department's policies to a subordinate whom he was supposed to be counseling). In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court recognized that the potential for disruption in the workplace, and perhaps the severity of that disruption, depends on the position held by the aggrieved former employee. The Court observed:

> [I]n weighing the [government's] interest in discharging an employee based on any claim that the content of a statement made by an employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words

---

**24.** A slightly different set of factors might also be relevant to a court's evaluation. Those are:

whether the employee's speech (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails."

*McVey v. Stacy,* 157 F.3d 271, 278 (4th Cir.1998) (citing *Rankin v. McPherson,* 483 U.S. 378, 388–91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

they speak will vary with the extent of authority and public accountability the employee's role entails.

*Rankin,* 483 U.S. at 391, 107 S.Ct. 2891. There, the employee, a clerical employee at a constable's office, commented to a coworker, following the assassination attempt on President Reagan, "if they go for him again, I hope they get him." *Id.* at 380, 107 S.Ct. 2891. The Court held that her comment did not subject her to termination because she served in no "confidential, policymaking, or public contact role" and, thus, "the danger to the [office's] successful function [was] minimal." *Id.* at 390–91, 107 S.Ct. 2891.

In *Warner v. Town of Ocean City,* 81 Md.App. 176, 567 A.2d 160 (1989), the Court of Special Appeals applied *Rankin's* reasoning, obtaining a different result. There, the intermediate appellate court held that the *Pickering* balancing favored the defendant city, where the plaintiff, a police officer, was fired for sending an anonymous letter to the mayor and city council criticizing the promotion of another police officer. The court based its decision, in part, on its assessment of the plaintiff's job duties, reasoning that the police department is "quasi-military in its structure and organization. It is founded on principles of discipline and rank, and the type of criticism at issue would *per se* undermine the relationship between [the plaintiff] and his superiors." *Warner,* 81 Md.App. at 184, 567 A.2d at 164.

In the present case, the Circuit Court's examination of the *Pickering* balancing failed to address the job duties of Plaintiffs at the SAO. While the court concluded that Plaintiffs' positions as VWCs subjected them to the *Elrod/Branti* test, it did not indicate what, if any, bearing their positions had on the prospect or gravity of potential disruption in Newell's administration. As already explained, disputed facts concerning the actual job duties inherent in Plaintiffs' positions prevent us from discerning the true nature of the Plaintiffs' positions on this record. Thus, even if the Circuit Court considered the nature of their positions in its *Pickering* analysis, reconsideration of this aspect of its decision still would be necessary. On remand, Plaintiffs' positions are but considerations for pur-

poses of the *Pickering* test; they are not determinative. Certainly, some employees that nonetheless could be dismissed categorically for patronage reasons have jobs with less potential to disrupt the workplace than others that also could be dismissed categorically for patronage reasons.

The Circuit Court also erred in its application of the *Pickering* test by requiring the State Defendants to show that Newell's interest in workplace efficiency and harmony existed at the time Plaintiffs engaged in their campaign activity. The *Pickering* test is not so rigid. To be sure, Newell did not have any managerial interest in the operations of the SAO until he took office, which occurred after Plaintiffs engaged in campaign activity against him. The fact that Newell was not the administrative head of the SAO while Plaintiffs campaigned for Greenleaf works in Plaintiffs' favor. Nevertheless, the fallout from Plaintiffs' campaign activity could have continued. Thus, the Circuit Court should have considered all of the relevant circumstances. In this regard, *O'Leary, supra,* is instructive. There, the Clerk of the Circuit Court for Carroll County fired the deputy clerk who ran against him, after he defeated the deputy in the general election. *O'Leary,* 313 Md. at 191, 545 A.2d at 18. We found summary judgment for the clerk improper, but remanded the matter for the trial court to conduct a *Pickering* balancing test. *Id.* at 206, 545 A.2d at 26. In doing so, we implicitly recognized that the harm done to a public employer by an employee's campaign activity may continue to be realized after the election dust settles.

To conclude this part of our opinion, we shall outline the analytical framework for a court considering a dispositive motion involving a First Amendment claim by a discharged government employee against her or his former employer. The initial task for a court is to discern whether the employee alleges that she or he was terminated based solely on her or his political beliefs. *See O'Leary,* 313 Md. at 204, 545 A.2d at 25 (noting that "the critical first step in any adjudication in the area of public employee discharge is selection of the correct test or procedure"). If the answer is "yes," the narrow *Elrod/Branti* test applies. The court then determines, as a

matter of law (assuming no genuine dispute of material fact is generated), whether the employee's position embraced " 'decision making on issues where there is room for political disagreement on goals or their implementation.' " *See Nader*, 549 F.3d at 959 (quoting *Stott*, 916 F.2d at 141–42). If it did, the court must resolve the propriety of the employer's reliance on the employee's political views as a bellwether of performance. This inquiry may go beyond consideration of the employee's party affiliation, sometimes allowing an assessment of the employee's political support for her or his employer; however, the employee's opinions concerning matters unrelated to the employer or the employer's policies are not a proper basis for the employer's decision to discharge the employee.

Determining whether an employee's position subjected her or him to a politically-motivated discharge is a question law for the court; however, determining "the particular duties" of the employee's position is a question for the fact-finder. *Hobler*, 325 F.3d at 1151 (quoting *Walker*, 272 F.3d at 1132). If, after its analysis, the court determines that the employee's position did not subject her or him to a politically motivated discharge, or that the employee's particular beliefs were not relevant to job performance, *Elrod/Branti* becomes a sword for the employee; however, the employee still must prove to the trier of fact that she or he was fired for her or his beliefs, and not for speech or expressive conduct.

Where, as in the present case, an employee alleges that she or he was terminated for engaging in speech or expressive conduct, the *Pickering* test governs. *O'Leary*, 313 Md. at 205, 545 A.2d at 25. In applying the *Pickering* test, a court determines the constitutionality of the employer's action by balancing the need for an efficient, congenial workplace against the employee's right to speak as a citizen on "matters of public concern." *Pickering*, 391 U.S. at 563, 88 S.Ct. 1731. This endeavor necessarily requires the court to determine whether the employee was speaking as a private person, and not on behalf of her or his employer. *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. It also requires the court to determine that the speech bore on a matter of public concern. *Connick*,

461 U.S. at 147–48, 103 S.Ct. 1684. If either prong fails, the balance tilts in favor of the employer, ordinarily ending the court's inquiry. Should the court conclude that the employee spoke as a citizen on a matter of public concern, however, it must consider the government's needs as an employer, paying particular attention to the context of the expressive conduct. *Id.* at 152–53, 103 S.Ct. 1684. The nature of the employee's position is also significant. *DiGrazia,* 288 Md. at 450, 418 A.2d at 1199. Indeed, some public employees likely have the potential to disrupt the workplace more significantly than an others further down the organizational hierarchy. *Id.* at 450–51, 418 A.2d at 1199; *see also Rankin,* 483 U.S. at 391, 107 S.Ct. 2891. Thus, a court should consider the closeness of the employee's work relationships with those affected by her or his conduct, as there is a greater potential for unrest where employees work closely together. *See Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684. Of course, the government's onus varies according to how substantially the employee's speech touches on a matter of public concern, requiring that the government show a higher potential for disruption, or a more severe disruption, in some cases, but not others. *Id.* at 152, 103 S.Ct. 1684. The *Pickering* balancing is ultimately a question of law for the court; however, here too, disputed factual matters, to the extent they are material, are appropriate for resolution by the trier of fact. *DeBleecker,* 292 Md. at 511, 438 A.2d at 1355.

If the *Pickering* balancing favors the employee, the employee must prove to the trier of fact that the employer's decision was due wholly or substantially to the protected speech or conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *O'Leary,* 313 Md. at 201, 545 A.2d at 23. If that obstacle is overcome, the burden shifts to the employer, allowing the employer to attempt to establish that the employee nevertheless would have been fired for a lawful reason. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *O'Leary,* 313 Md. at 201, 545 A.2d at 23. The Supreme Court has declared that political patronage is a lawful basis for firing a policymaking employee. *O'Hare,* 518 U.S. at 718–19, 116 S.Ct. 2353; *Branti,* 445 U.S. at 517, 100

S.Ct. 1287. Thus, a government employer may defend its decision by proving that it elevated political support to a job requirement. In such a case, *Elrod/Branti* serves as a shield for the employer, requiring the court to determine whether the employee's position subjected her or him to a political patronage dismissal.

## II.

■ Plaintiffs bring their First Amendment claim against Newell individually pursuant to 42 U.S.C.A. § 1983, which provides a plaintiff with a mechanism for redressing a violation of her or his rights under federal law. As this Court previously explicated:

> Section 1983 permits a plaintiff to recover damages when an individual, acting under the color of state law, transgresses a federally created right of the plaintiff. The text of the statute and cases analyzing § 1983 actions dictate that a defendant in a § 1983 action must be a "person." A state public official, sued in his or her official capacity, is not considered a "person" when a plaintiff brings a § 1983 action for monetary damages. The purpose behind placing state officials sued in their official capacities out of range of a § 1983 claim is that such a suit, in essence, is a suit against the state, which is an impermissible defendant in a § 1983 action. If the plaintiff prevails, the state treasury, not the state official personally, will be responsible for paying the assessed damages....
>
> ....
>
> State officials, however, may be sued in their individual capacity. To establish personal liability upon a state official, a plaintiff must show that the official, while acting under the color of state law, caused the deprivation of a federally recognized right.

*Okwa v. Harper*, 360 Md. 161, 192–94, 757 A.2d 118, 135–36 (2000) (internal citations omitted).

The State Defendants argue that Newell is protected by qualified immunity from suit and liability under § 1983. The

Circuit Court agreed with the State Defendants, finding qualified immunity provided an alternate basis for awarding summary judgment to Newell on Count I. The Court of Special Appeals reversed, holding that Plaintiffs generated a jury question concerning the objective reasonableness, in light of the clearly established law at the time, of Newell's decision to terminate Plaintiffs. *Runnels*, 179 Md.App. at 208–09, 944 A.2d at 1207. We agree.

 "Qualified immunity is a defense that must be pleaded by a defendant official." *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). It protects public officials "insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A court considering an assertion of qualified immunity need not determine always whether a plaintiff alleges a constitutional violation, if the court can conclude that the asserted right, if violated at all, was not "clearly established" when the violation occurred. *Pearson v. Callahan*, —— U.S. ——, ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565, 576 (2009). The question of whether a particular right is "clearly established" is a question of law, potentially appropriate for determination at the summary judgment stage. *Siegert*, 500 U.S. at 232, 111 S.Ct. 1789; *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995). Resolution "turns on the 'objective legal reasonableness' of the [defendant's] action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Okwa*, 360 Md. at 198–99, 757 A.2d at 138 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *see also Wilson v. Layne*, 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). "[T]his inquiry 'must be undertaken in light of the specific context of [a] case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). That is, " '[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right.'" *Id.* at 199, 125 S.Ct. 596 (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151).

Plaintiffs here claim that *O'Leary, supra,* is clearly established law. *O'Leary,* however, establishes only that courts in Maryland apply the *Pickering* test, unless patronage was the public employer's sole motivation for firing the aggrieved employee; *O'Leary* does not establish what the outcome of the *Pickering* balancing test would be in the present case. *See O'Leary,* 313 Md. at 205, 545 A.2d at 25. Regarding the predictability of *Pickering's* application to a given set of facts,

The Supreme Court has never established a bright-line standard for determining when the State as an employer may take action adverse to an employee in response to that employee's speech. Instead, the Court has balanced the interest of the employee in commenting on matters of public concern against the interest of the employer in performing public services efficiently. The court must necessarily balance these interests on a case-by-case basis. Because of this case-by-case approach, "there will rarely be a basis for [an] *a priori* judgment that the termination or discipline of a public employee violated 'clearly established' constitutional rights." *Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where [the] Pickering balancing [test] would lead to the inevitable conclusion that the [adverse action] was unlawful.*

*Rogers v. Miller,* 57 F.3d 986, 989 (11th Cir.1995) (italics and alterations in original) (quoting *Dartland v. Metro. Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989)).

The foregoing notwithstanding, because many of the material factual disputes or omissions identified in Parts I and III of this opinion, which keep this case from being an appropriate object of summary judgment on the record as it exists at present, bear on Newell's potential liability under § 1983, we think it necessary to allow the matter of his qualified immuni-

ty to be considered anew on remand. Whether a reasonable State's Attorney should have known that firing Plaintiffs would violate their First Amendment rights to free speech needs to be considered on a more developed record. Neither this Court nor the Court of Special Appeals have provided particularized guidance concerning the alleged specific conduct at issue here or its potential impact on an office like Newell's with only 10 employees. Accordingly, the judgment of the intermediate appellate court reversing summary judgment in favor of Newell on the § 1983 claim in Count I is affirmed.

### III.

██ The Circuit Court also awarded summary judgment to Newell on Count II, alternatively, concluding that he enjoyed immunity under the MTCA. The Court of Special Appeals reversed, holding that disputed issues of material fact existed concerning whether Newell acted with malice when he fired Plaintiffs. *Runnels,* 179 Md.App. at 213–14, 944 A.2d at 1210. The intermediate appellate court was correct.

This Court recently explicated the relevant contours of the MTCA:

> The MTCA was enacted in 1981 as a waiver of the State's sovereign immunity for tortious acts or omissions committed within the scope of the public duties of "state personnel," and committed without malice or gross negligence.... "[S]tate personnel" are immune from suit and from liability in tort for acts or omissions committed within the scope of their public duties and without malice or gross negligence, and when the State waives its immunity pursuant to the MTCA.

*Barbre v. Pope,* 402 Md. 157, 173–74, 935 A.2d 699, 710 (2007) (internal citations omitted). In other words, liability of the State and liability of individual State personnel are mutually exclusive. If the State is liable, the individual is immune; if the individual is liable, the State is immune. As a State's Attorney, Newell is "State personnel" for purposes of the MTCA. *See* State Government Article § 12–101(p).

Unlike qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one. *Okwa,* 360 Md. at 198, 757 A.2d at 138; *Shoemaker v. Smith,* 353 Md. 143, 161, 725 A.2d 549, 558 (1999). The test for immunity under the MTCA is not whether the defendant's conduct was objectively reasonable. *Shoemaker,* 353 Md. at 165, 725 A.2d at 561. It is whether the defendant acted with malice or gross negligence. *See* Maryland Code (1984, 2006 Repl.Vol.), Courts & Judicial Proceedings Article, § 5–522(b) (detailing immunity under MTCA). This Court has recognized consistently that the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact. *Barbre,* 402 Md. at 190, 935 A.2d at 718–19; *Okwa,* 360 Md. at 181–82, 757 A.2d at 129; *Shoemaker,* 353 Md. at 164, 725 A.2d at 560. Thus, the question before us is whether, on the present record, there is a genuine dispute as to whether Newell acted with malice or gross negligence when he fired Plaintiffs.

Both malice and gross negligence are amorphous concepts. *See Shoemaker,* 353 Md. at 161, 725 A.2d at 559 (applying the MTCA and commenting that " 'malice' has been [ ] troublesome ..., because it has been used in many different contexts and, as a result, has been defined in different ways"); *see also Barbre,* 402 Md. at 187, 935 A.2d at 717 (applying the MTCA and commenting that "[i]ssues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross negligence"). In the context of assessing immunity under the MTCA, malice is defined as behavior "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre,* 402 Md. at 182, 935 A.2d at 714 (quoting *Lee v. Cline,* 384 Md. 245, 268, 863 A.2d 297, 311 (2004)); *see also Shoemaker,* 353 Md. at 163–64, 725 A.2d at 560 (commenting that the required showing of malice, for purposes of defeating individual immunity under the MTCA, is the standard for "actual malice," as opposed to "implied malice").

More than 30 years ago, this Court emphasized that " '[m]alice ... [is] oftenest inferred from acts and circumstantial evidence. [It is] seldom admitted and need not be proved by direct evidence.' " *Henderson v. Md. Nat'l Bank,* 278 Md. 514, 520, 366 A.2d 1, 5 (1976) (quoting *McClung–Logan v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961)). Accordingly, those cases involving State personnel immunity under the MTCA in which we found the inference of malice sufficient to defeat a defendant's motion for summary judgment provide useful guidance. In *Barbre,* for example, we held that summary judgment was not proper for the defendant deputy sheriff because, under the plaintiff's version of events, the deputy sheriff shot the plaintiff in the neck while the plaintiff had his hands raised in surrender. 402 Md. at 186, 935 A.2d at 717. The plaintiff's version of events was sufficient to give rise to an inference of malice on the deputy sheriff's part. *Id.* In *Lee v. Cline,* we likewise concluded that summary judgment for the defendant was not proper where the plaintiff, an African–American motorist, alleged that the defendant deputy sheriff stopped him initially for a routine traffic matter, but prolonged the stop for 40 minutes, calling a canine unit to conduct a drug scan of the vehicle and referring to the plaintiff as a "suspect." 384 Md. at 269–70, 863 A.2d at 312. We agreed with the plaintiff in *Lee* that those facts generated a jury issue regarding malice. *Id.* at 270, 863 A.2d at 312. And in *Okwa,* we determined summary judgment for the defendants to be improper where the plaintiff alleged that Maryland Transportation Authority police officers forcibly threw him on the ground and struck him in the head and neck. 360 Md. at 182, 757 A.2d at 129.

In the present case, Plaintiffs adduced enough facts tending to suggest malice to defeat Newell's motion for summary judgment. The record contains proffered facts sufficient for a trier of fact, if it believed those facts, to determine that Plaintiffs' campaign activity played a substantial part in Newell's decision to fire them. Although this alone might not mean Newell acted with malice, Newell acknowledged that he intended to retain those SAO employees that he did not believe

had "work ethic issues." Nonetheless, when he informed Plaintiffs of his decision to fire them, he told them that their work performances were not a problem. Then, allegedly, he indicated to Runnels that he was firing them for their campaign activity by sarcastically proclaiming that their campaign activity did not play a role in his decision. Moreover, Plaintiffs produced evidence that, during the election season, Newell was agitated by their support for Greenleaf. Together, this evidence, if credited by a fact-finder, permits the drawing of a permissible inference that Newell's dismissal of Plaintiffs was a targeted act of retribution.

Plaintiffs also generated a material dispute of fact concerning the issue of possible gross negligence on Newell's part. This Court treats "gross negligence" under the MTCA " 'as something more than simple negligence, and likely more akin to reckless conduct.' " *Barbre*, 402 Md. at 187, 935 A.2d at 717 (quoting *Taylor v. Harford County Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004)). We elaborated that gross negligence is

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another,[25] and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and wilfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Id.* (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635, 495 A.2d 838, 846 (1985); *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968)). In *Barbre*, we held that "the fact that [the defendant deputy] ordered [the plaintiff], who was

---

**25.** The State Defendants do not argue, and accordingly we do not consider, whether the tortious transgression of a Constitutional or statutory right, such as the right to speak freely on political matters, demands standards for malice or gross negligence different from that which may be required where there is a physical injury or an injury to property, bearing in mind that Plaintiffs do not allege the former and, as at-will employees, cannot allege the latter.

unarmed, to raise his hands, and that after [the plaintiff] complied with the request, [the defendant deputy] approached with his gun drawn and shot [the plaintiff] in the neck, could support an inference that [the defendant deputy] acted grossly negligent." *Id.* at 190, 935 A.2d at 719.

Similarly, in the present case, a trier of fact reasonably could infer that Newell's decision to terminate Plaintiffs reflected a conscious disregard for their rights as employees. Evidence indicates that Newell was agitated by Plaintiffs' campaigning. Moreover, he gave no firm reason for firing them, if it is true that he intended to retain employees without "work ethic issues" and, as he explained to Plaintiffs, he did not have a problem with their performances.

The State Defendants and supportive *Amici* characterize Newell's decision as a legal mistake (assuming he unlawfully dismissed Plaintiffs for their campaign activity). This may be so. A trier of fact may choose to believe that Newell's decision reflected his best judgment concerning the successful and efficient running of the SAO. We hold, however, only that Plaintiffs articulated facts tending to show that Newell's decision to fire them was, at worst, a targeted reprisal for speaking against him or, at best, a reckless disregard for their rights to free speech. Accordingly, the Circuit Court improperly granted summary judgment on Count II to Newell.

### IV.

As an alternative theory of relief, Plaintiffs assert, in Count III, a common law claim of abusive discharge against the State Defendants. According to Plaintiffs, the General Assembly broadened the protection accorded public employees beyond the minimum requirements of the Federal and State Constitutions, granting public employees a near absolute right to "participate in any political activity and express any political opinion." Plaintiffs rely on two statutes: (1) Maryland Code (2004 Repl.Vol.), State Personnel and Pensions Article, § 2–304 (pertaining to State employees); and (2) Maryland Code (1957, 2005 Repl.Vol.), Article 24, § 13–103 (pertaining to

employees of local governments).[26] Plaintiffs postulate that SP & P § 2–304 and Art. 24 § 13–103 stand as a clear mandate of public policy, but that they have no remedy for their violation. Accordingly, they assert entitlement to seek redress through a common law abusive discharge claim. Rejecting Plaintiffs' argument, the Circuit Court and the Court of Special Appeals both held that Plaintiffs' abusive discharge claim is duplicative of the Federal and State Constitutional claims of Counts I and II. *See Runnels,* 179 Md.App. at 214–15, 944 A.2d at 1210–11.[27] We disagree. Plaintiffs' abusive discharge claim in Count III is not duplicative of their constitutional claims in Counts I and II.[28]

We recently reiterated the familiar rules of statutory interpretation:

In construing a statute, we look first to the plain language of the statute, and if that language is clear and unambiguous, we look no further than the text of the statute. A plain reading of the statute assumes none of its language is superfluous or nugatory. "We neither add nor delete words to a clear and unambiguous statute to give it a meaning not

---

**26.** For clarity, subsequent references to the State Personnel and Pensions Article and Article 24 will appear as "SP & P" and "Art. 24," respectively.

**27.** In their brief, Plaintiffs argue that the County potentially is liable to them for their abusive discharge claim under a common law *respondeat superior* theory, setting this claim apart from the constitutional claims in Counts I and II. Nonetheless, the intermediate appellate court affirmed the trial court's alternative holding that, under Count III as well as Counts I and II, Plaintiffs did not advance a case sufficient to impose liability on the County for Newell's alleged wrong. Plaintiffs did not appeal that decision to this Court, and we shall not consider whether the County could be liable to Plaintiffs under Count III.

**28.** In its Opinion and Order, the Circuit Court did not discuss Newell's potential liability or immunity under the MTCA as it relates to Plaintiffs' abusive discharge claim. Additionally, the parties do not address the issue in their briefs. We note, however, that the MTCA does not distinguish between constitutional torts and common law torts. Accordingly, the same standards of malice and gross negligence govern, if and when the lower court addresses the question of immunity from the claim under Count III.

reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." We have often stated that if the language of the statute is not ambiguous, either inherently or by references to other relevant laws or circumstances, our inquiry as to legislative intent ends. If the meaning of the plain language is ambiguous or unclear, to discern legislative intent, we look to the legislative history, prior case law, the purposes upon which the statutory framework was based, and the statute as a whole.

*Bost v. State,* 406 Md. 341, 350, 958 A.2d 356, 361 (2008) (internal citations omitted).

SP & P § 2–304 provides, in relevant part:

(a) *Public policy; employee rights.*—(1) Employment by the State does not affect any right or obligation of a citizen under the Constitution and laws of the United States or under the Constitution and laws of the State.

(2) Except as otherwise provided in this section or by federal law, a State employee:

(i) may freely participate in any political activity and express any political opinion . . .

. . . .

(b) *Effect of section.*—Notwithstanding any other law of the State effective on or before June 30, 1973, the restrictions imposed by subsection (c) of this section are the only restrictions on the political activities of an employee . . .

. . . .

(c) *Restrictions on political activities.*—An employee may not:

(1) engage in political activity while on the job during working hours; or

(2) advocate the overthrow of the government by unconstitutional or violent means.

Likewise, Art. 24 § § 13–103 & –105 provide that an employee of a local entity "may freely participate in any political activity and express any political opinion," subject to the same

limitations—that the activity neither occur on the job nor advocate overthrowing the government.

We agree that the statutes relied on by Plaintiffs provide public employees with greater protection than that required by the Federal and State Constitutions. As we explained *supra* in Part I of our analysis, in constitutional jurisprudence, a government employee's right to speak on matters of public concern without fear of reprisal in the workplace exists only insofar as her or his interests in engaging in that speech outweighs the possible harm to workplace efficiency and harmony. Through legislative grace, however, the General Assembly singled out one form of speech—participation in political activity and expression of political opinion—and gave public employees a gently fettered statutory right to engage in that form of speech.

The State Defendants argue that SP & P § 2–304 and Art. 24 § 13–103 merely codify a public employee's right to political speech, consistent with the protections of the First Amendment. This argument is not persuasive for two reasons. First, SP & P § 2–304 and Art. 24 § 13–103 are targeted in their focus. Whereas a *Pickering* balance under the First Amendment pertains to all speech on matters of public concern, the only speech governed by SP & P § 2–304 and Art. 24 § 13–103 is political activity. It defies logic to suggest that the General Assembly did not intend to provide broader protection to government employees than what *Pickering* requires, considering that the General Assembly selected a very specific subset of speech on matters of public concern as the subject of SP & P § 2–304 and Art. 24 § 13–103. Second, holding that SP & P § 2–304 and Art. 24 § 13–103 do not provide broader protection than *Pickering* would conflict with cardinal rules of statutory interpretation. As explained, courts loathe interpreting a statute in a manner that renders any of its language surplusage; however, holding that SP & P § 2–304 and Art. 24 § 13–103 protect a public employee's right to engage in political activity, except where the Constitution allows the government to fire the employee

for that speech, would do just that to the entire public policy pronouncement articulated in the statutes. Additionally, adopting the interpretation advocated by the State Defendants would contravene the canon of *inclusio unius est exclusio alterius,* the principle that "the expression of one thing is the exclusion of the another." *See WFS Fin. v. Mayor of Balt.,* 402 Md. 1, 14, 935 A.2d 385, 393 (2007). The Legislature imposed two restrictions on a public employee's right to engage in political activity, requiring only that such activity not occur at work nor advocate the overthrow of the government. The Legislature could have imposed additional limitations on employee speech to the extent that the Constitution allows; however, it apparently elected not to do so.[29]

The State Defendants suggest that the policy behind SP & P § 2–304 and Art. 24 § 13–103 was merely the General Assembly's desire to reject the Hatch Act, which prohibited employees of the Federal government and certain state and local employees in federally funded positions from engaging in partisan political campaigning.[30] The Supreme Court twice upheld the Hatch Act, reasoning that it was a permissible, limited intrusion into the private lives of Federal employees. In *United Public Workers of Am. v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), the Court noted that the Hatch Act did not preclude all political activity, only partisan political activity. According to the Court, "[e]xpressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the government employee does not direct his activities toward party success." *United Pub. Workers,* 330

---

**29.** Although not pertinent to this case, we note that SP & P § 2–304(b) allows for additional restrictions on the political activities of employees working for local boards of election and employees of the Department of Legislative Services. Art. 24 § 13–104 also allows for the additional restrictions on certain "quasi-judicial" employees of Montgomery County.

**30.** Congress amended the Hatch Act most recently in 1993. For the most part, it no longer precludes employees from engaging in partisan political activity. *See* 5 U.S.C.A. § § 7321 *et seq.* (2007).

U.S. at 100, 67 S.Ct. 556. In *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court reaffirmed *United Pub. Workers*. There, the Court relied on *Pickering*, observing that the balance Congress chose to strike by not allowing Federal employees to engage in partisan political activity was constitutionally "sustainable," but that Congress was "free to strike a different balance" if it chose to do so. *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. 2880 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). The State Defendants argue that, by enacting SP & P § 2–304 and Art. 24 § 13–103, the General Assembly simply chose to strike a different balance than the Federal Government did through the Hatch Act. To that end, the State Defendants posit that the General Assembly intended only "to affirm that the forced political neutrality ... of federal civil-service rules is not required of Maryland public employees." The Legislature, according to the State Defendants, did not "intend[ ] to obliterate the distinctions drawn in constitutional jurisprudence that allow governmental interests in the efficient and democratically accountable provision of public services to be balanced against employee free-expression rights." We cannot subscribe to the State Defendant's reasoning. Regardless of whether the General Assembly enacted SP & P § 2–304 and Art. 24 § 13–103 as a response to the Hatch Act, the terms of the statutes very clearly provide that "the *only* restrictions on the political activities" of employees are that they not engage in political activity at work and not advocate the violent overthrow of the government. *See* SP & P § 2–304(b); Art. 24 § 13–105 (italics added). We shall not read into them additional limitations on the political activities of public employees.

The State Defendants next posit that reading SP & P § 2–304 and Art. 24 § 13–103 to accord public employees greater protection than they otherwise enjoy under constitutional jurisprudence leads to an absurd result. They contend that

> the unqualified right that the [P]laintiffs find in [SP & P § 2–304 and Art. 24 § 13–103] to freely engage in campaign activities against one's employer would be enjoyed equally

by "Joe the Plumber" in the skilled service and by "Jane the Director for Policy Development," who occupies a special appointment. Under the [P]laintiffs' view, [SP & P § 2–304 and Art. 24 § 13–103] would prevent the Cabinet Secretary who employs Joe and Jane from dismissing Jane—regardless of her *Branti*-exempt status, and regardless of how thoroughly her antagonistic campaign activities eroded the Secretary's confidence in Jane's ability to carry out the Administration's policy agenda faithfully.

■ This argument, however, does not advance the premise for which it is asserted. First, it confuses employee speech with political patronage. SP & P § 2–304 and Art. 24 § 13–103 pertain only to "political activity," a subset of cases that otherwise would be subject to the limits of the *Pickering* balancing test; they do not affect, in any way, a government employer's right to discharge employees for patronage reasons. Thus, in the State Defendant's hypothetical, the Secretary could fire "Jane the Director" on the basis of political patronage, assuming the Secretary elevated political support to a job requirement. Second, the State Defendants' argument improperly equates the protection of political activity of SP & P § 2–304 and Art. 24 § 13–103 with protection from discharge based on performance. Nothing in SP & P § 2–304 or Art. 24 § 13–103 prohibits a government employer from firing an at-will employee if the employer does not have the utmost confidence in the employee's ability to carry out the employer's policies. SP & P § 2–304 and Art. 24 § 13–103, however, do not allow an employer to avoid application of the statutes by contriving suspicion of an employee's celerity or capabilities in order to justify firing the employee because of the employee's political activity.

We hold that SP & P § 2–304 and Art. 24 § 13–103 provide greater protection than does the *Pickering* balancing test for public employees. Accordingly, Plaintiffs' abusive discharge claim is not duplicative of their constitutional claims; however, our holding does not mean necessarily that Plaintiffs may pursue that claim.

Under the common law employment at-will doctrine, an employment relationship "may be terminated legally at the pleasure of either party at any time." *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 422, 823 A.2d 590, 602 (2003). In *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), however, this Court recognized the tort of abusive discharge as a judicially-created exception to the employment at-will doctrine. We held that a discharged, at-will employee may sue her or his former employer if "the motivation for the discharge contravene[d] some clear mandate of public policy." *Adler*, 291 Md. at 47, 432 A.2d at 473. More recently, we elaborated on the contours of the tort:

> Consistent with a purpose of this tort, namely to provide a remedy for otherwise unremedied violations of public policy, we have been careful to "be precise about the contours of actionable public policy mandates" by confining the scope of such mandates in the wrongful discharge context to "clear and articulable principles of law" .... [A] public policy mandate providing a basis for a wrongful discharge claim ordinarily should be derived from constitutional or statutory expressions of public policy. Because the establishment of "an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and the declaration of public policy is normally the function of the legislative branch," we have strived to limit our purview to public policies "reasonably discernable from prescribed constitutional or statutory mandates."

> Even where statutory and regulatory provisions supply a source of a public policy in the analysis of a wrongful discharge claim, if those provisions already provide an adequate and appropriate civil remedy for the wrongful discharge the claim will fail. The tort will not lie if the statute provides a civil remedy that would render relief via a wrongful discharge action duplicative. To do so would interfere with the balancing of rights and adequacy of remedies determined by the legislature.

*Porterfield*, 374 Md. at 423–24, 823 A.2d at 602–03 (internal citations omitted). Thus, we limit the availability of the

abusive discharge cause of action to cases where an employee's termination contravened a clear mandate of public policy and not to allow the cause of action would leave the employee without a remedy. *Id.* at 422–23, 823 A.2d at 602–03.

Recourse to *Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996), is useful in analyzing the present case. There, we said that the "[d]eclaration of public policy is normally the function of the legislature." *Molesworth,* 341 Md. at 630, 672 A.2d at 612. We considered whether the plaintiff, a veterinarian, could pursue an abusive discharge cause of action against her former employer, who allegedly fired her because of her gender. The pertinent declaration of public policy in that case came from the Fair Employment Practices Act, which provided:

> It is hereby declared to be the policy of the State of Maryland ... to assure all persons equal opportunity in receiving employment ... regardless of race, color, ancestry or national origin, sex, age, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents.

*Id.* at 628, 672 A.2d at 611–12 (italics in original) (quoting Maryland Code (1994 Repl.Vol., 1995 Supp.), Art. 49B, § 14). Other provisions of the act made it unlawful for an employer to discharge an employee on the basis of the employee's gender, among other prohibited reasons, and created an administrative method for resolving complaints; however, those provisions only applied to employers with more than 15 employees. *Id.* at 631, 672 A.2d at 613. Because her former employer had fewer than 15 employees, the act's prohibition against terminations based on gender did not apply and the plaintiff could not take advantage of the administrative remedy provided by the act. *Id.*

Although the Fair Employment Practices Act did not protect her, the plaintiff nonetheless could pursue an abusive

discharge cause of action, according to the Court. *Id.* at 636, 672 A.2d at 616. Initially, we resolved that the policy articulated by the act provided a clear mandate repudiating *all* gender-based discrimination in the workplace, even though the act, by its terms, extended its protections and remedies only to employees who work for employers with 15 or more employees. *Id.* at 632, 672 A.2d at 613–14. Then, observing that "we presume that the legislature does not intend to allow violations of [ ] policy, absent some indication of a contrary intent," we concluded that the plaintiff's common law claim against her employer was allowed. *Id.* at 632, 672 A.2d at 614. In so doing, we distinguished other cases in which we declined to recognize common law abusive discharge claims where the plaintiffs had other remedies available to them. *Id.* at 636, 672 A.2d at 616 (distinguishing *Makovi v. Sherwin–Williams, Co.*, 316 Md. 603, 561 A.2d 179 (1989) and *Chappell v. S. Md. Hosp.*, 320 Md. 483, 578 A.2d 766 (1990)).

In the present case, SP & P § 2–304 and Art. 24 § 13–103 provide at least as clear a mandate of public policy as was found in *Molesworth.* The provisions are broad in scope, applying to all local and state government employees. Nonetheless, the record here does not reveal whether the Plaintiffs actually fell outside of any apparatus set-up to address the unlawful terminations of public employees. Thus, we cannot assess fully whether Plaintiffs had another remedy available to them. Plaintiffs claim that none of the procedures and remedies otherwise available to State employees were available to them; however, their assertion alone is not dispositive. Accordingly, the record must be developed before the Circuit Court may determine on remand whether Plaintiffs had, as employees of a State official, an alternative administrative remedy to seek redress for allegedly losing their jobs due to their exercise of their statutory right to engage in political activity.[31]

---

**31.** We note that SP & P § 2–304 and Art. 24 § 13–103 do not protect the political activities of public employees if those activities occur in the

## V.

■ The Circuit Court granted summary judgment to the County on Counts IV and VI—Plaintiffs' overtime claims under the FLSA and the MWHL. In doing so, the trial judge reasoned that the County was not a joint employer of Plaintiffs (who were State employees).[32] The Court of Special Appeals reversed, holding that disputed issues of material fact preclude summary judgment on that basis. *Runnels,* 179 Md.App. at 229, 944 A.2d at 1219. We affirm the holding of the intermediate appellate court.

■ The FLSA and its "State parallel," the MWHL, require that an employer "pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that [an] employee works during one workweek." *Friolo v. Frankel,* 373 Md. 501, 513, 819 A.2d 354, 361 (2003).[33] The statutory definition of an "employer" is broad, encompassing entities that act "directly or indirectly in the interest" of an employer with respect to an employee. 29 U.S.C.A. § 203; Maryland Code, Labor & Employment Article, § 3–401(b).[34] The term

workplace. One of the contested facts in this case is whether, and to what extent, Plaintiffs engaged in political activity on the job.

**32.** The County points out in a footnote to its brief that compensatory time is not always violative of the FLSA. We agree. The FLSA allows public employers to award compensatory time, instead of overtime, on a time and a half basis, as long as the affected employees agree in advance to accept compensatory time. *Moreau v. Klevenhagen,* 508 U.S. 22, 23, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993). This, however, was not a basis on which the Circuit Court relied in awarding summary judgment to the County.

**33.** The FLSA provides, "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.A § 207(a)(1). The MWHL provides, "each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage." Maryland Code, Labor and Employment Article, § 3–415(a).

**34.** The distinction between the statutes is subtle and, in the final analysis, we think unimportant for present purposes. Under the FLSA,

"is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Bonnette v. Cal. Health & Welfare Agency,* 704 F.2d 1465, 1469 (9th Cir.1983).[35] Accordingly, an employee may have more than one employer at a given time. *Barfield v. N.Y. City Health & Hosps. Corp.,* 537 F.3d 132, 141 (2d Cir.2008); *Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298, 305 (4th Cir.2006); *see also* 29 C.F.R. § 791.2(a) (2008). So called "joint employers" are liable, " 'both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions.' " *Schultz,* 466 F.3d at 305 (alterations in original) (quoting 29 C.F.R. at 791.2(a)). Assessing whether an entity is a joint employer, in this context, turns on the "economic realities" of the relationship between the employee and the alleged employer. *Barfield,* 537 F.3d at 143; *see also Schultz,* 466 F.3d at 306 ("The joint employment inquiry must 'take[ ] into account the real economic relationship between the employer who uses and benefits from the services of the workers and the party that hires or assigns the workers to that employer.' " (quoting *Ansoumana v. Gristede's Operating Corp.,* 255 F.Supp.2d 184, 193 (S.D.N.Y.2003))). Many courts adhere to some variation of the so called "economic reality test"[36] in making this assessment. *Barfield,* 537 F.3d at 141–43; *Torres–Lopez v. May,* 111 F.3d 633, 639 (9th Cir.1997); *Itzep v. Target Corp.,* 543 F.Supp.2d 646, 653 (W.D.Tex.2008); *Zachary v. Rescare Okla., Inc.,* 471 F.Supp.2d 1175, 1180–81

---

" '[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C.A. § 203(d). Under the MWHL, " '[e]mployer' includes a person who acts directly or indirectly in the interest of another employer with an employee." Maryland Code, Labor & Employment, § 3–401(b).

**35.** For this reason, cases cited by the County and its supportive *Amici,* outside of the context of the FLSA or the MWHL, are of little persuasive force here.

**36.** This test is sometimes referred to alternatively as the "economic realities test."

(N.D.Okla.2006); *Beck v. Boce Group, L.C.*, 391 F.Supp.2d 1183, 1187–92 (S.D.Fla.2005); *Heath v. Perdue Farms, Inc.*, 87 F.Supp.2d 452, 457 n. 4 (D.Md.2000).

The economic reality test is fluid and often articulated differently by different courts. *See Itzep*, 543 F.Supp.2d at 653 n. 54 (commenting on the apparent "difference among the circuit courts regarding factors a court should consider in determining joint employment under the FLSA"). We subscribe here to the approach of the U.S. Court of Appeals for the Second Circuit, which has "identified *different sets of relevant factors* based on the factual challenges posed by particular cases." *Barfield*, 537 F.3d at 142 (italics added). That court articulated three tests "(1) to examine the degree of formal control exercised over a worker; (2) to distinguish between independent contractors and employees; and (3) to assess whether an entity that lacked formal control nevertheless exercised functional control over a worker." *Id.* at 143. The court noted, however, that these tests "provide '[ ] nonexclusive and overlapping set[s] of factors' to ensure that the economic realities test . . . is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.*

■■■ The apparent factual context of the present case leads us to conclude that the four-factor test for formal control is the most appropriate one. Under this version of the economic reality test, the pertinent considerations are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 142. The Second Circuit applied this test first in *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (1984), where an inmate working as a tutor at the prison where he was incarcerated sought back pay under the FLSA from the community college administering inmate education. The college asserted it was not the inmate's joint employer because the prison retained ultimate authority over all inmate labor;

however, the appellate court rejected this argument in light of the expansive, remedial nature of the FLSA. *Carter,* 735 F.2d at 12–13.[37] The appellate court held that summary judgment in favor of the college was not appropriate, reasoning as follows:

> In the instant case, accepting the facts and all reasonable inferences favorable to [the plaintiff] as the nonmoving party, [the college] made the initial proposal to "employ" workers; suggested a wage as to which there was "no legal impediment"; developed eligibility criteria; recommended several inmates for the tutoring positions; was not required to take any inmate it did not want; decided how many sessions, and for how long, an inmate would be permitted to tutor; and sent the compensation directly to the inmate's prison account.
>
> While perhaps not the full panoply of an employer's prerogatives, this may be sufficient to warrant FLSA coverage.

*Id.* at 15.

The same four-factor test has been applied by other courts in circumstances similar to those apparently involved here. *See Braddock v. Madison County,* 34 F.Supp.2d 1098, 1107 (S.D.Ind.1998) (applying four-factor test where court employees whose positions were funded by county government sought overtime pay from county); *Brickey v. County of Smyth,* 944 F.Supp. 1310, 1315 (W.D.Va.1996) (applying four-factor test where sheriff's deputies whose positions were funded by county government sought overtime pay from county). Indeed, here the County agrees with Plaintiffs that the test from *Carter*[38] supplies the correct analytical frame of reference,

---

**37.** At least one court criticized *Carter* for extending the protections of the FLSA to prisoners. *See Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1325 (9th Cir.1991). We rely on *Carter* as an example of an otherwise sound analysis under the economic reality test, but do not necessarily endorse its conclusion that Congress intended the FLSA to apply to prisoners. That issue is not before us.

**38.** The parties and the intermediate appellate court described the test as hailing from *Brickey v. County of Smyth,* 944 F.Supp. 1310 (W.D.Va.

contending only that the Court of Special Appeals misapplied the test.[39]

 Plaintiffs generated a jury issue as to whether the County was their joint employer for purposes of liability under the FLSA and the MWHL. The County budgeted for their salaries, as well as those of all other SAO employees. Former State's Attorney Jensen stated, among other things, that the County exerted control over the hiring process in the SAO, requiring that he get County permission for all new hires,

---

1996); however, it is the same four-factor test applied by the Second Circuit in *Carter.*

**39.** *Amici* supporting the County, however, suggest that a different test is more appropriate, characterizing the four-factor test as overly simplistic. They assert that the choice of test in this case is determinative and urge us to follow *Quinteros v. Sparkle Cleaning, Inc.,* 532 F.Supp.2d 762 (D.Md.2008), a case in which employees of a janitorial services company sought overtime pay under the FLSA from a movie theater with which the company contracted to provide its services. There, the U.S. District Court for the District of Maryland considered, in combination, two separate tests and, on that basis, determined that the plaintiffs failed to allege facts sufficient to establish that the movie theater was their joint employer. *Quinteros,* 532 F.Supp.2d at 776.

There are two reasons why we decline to follow *Quinteros.* First, one of the tests relied upon in *Quinteros* was the same four-factor test that the Court of Special Appeals relied on here; the only difference is that, in *Quinteros,* the District Court judge referred to it as the *Bonnette* test, *see id.* at 774–75 (quoting *Bonnette,* 704 F.2d at 1470), and, here, the intermediate appellate court referred to it as the *Brickey* test, *see Runnels,* 179 Md.App. at 224, 944 A.2d at 1216 (citing *Brickey,* 944 F.Supp. at 1315). Second, the other test relied on in *Quinteros* enumerated six factors geared to determining whether an alleged employer has functional control over an employee, where formal control is lacking. 532 F.Supp.2d at 774 (quoting *Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 72 (2d Cir.2003)). Such a test is useful in cases, like *Quinteros,* where the alleged employer receives the fruits of the employees' labor in a borrowed servant context. *See id.* at 775; *see also Barfield,* 537 F.3d at 135 (where certified nursing assistant was sent to work for hospital through health care referral agency and sought to hold hospital liable for overtime wages under FLSA); *Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 64 (2d Cir.2003) (where employees of subcontractor were sent to work for clothing manufacturer and sought to hold manufacturer liable). That is not the scenario here, as Plaintiffs were not benefitting, and have not claimed to be benefitting, the County with their labor. Thus, *Quinteros* is inapposite and does not affect the resolution of this case.

even if the salaries of the hires fell within a given SAO budget allocation. He indicated that he had to follow the County's personnel "handbook" when hiring staff. If he wanted to fire an employee, he said he needed the County's permission. Similarly, Greenleaf attested that the County stripped him of his right to hire a secretary for the Drug Task Force program, effectively terminated the employment of an investigator by eliminating the investigator's position, and told the SAO to rely on the County police for its investigations. While these averments, if believed, related to incidents that may have occurred before the time frame relevant to Plaintiffs' overtime claims, they could be construed as demonstrating a pattern of County control over SAO operations sufficient to establish the County as Plaintiffs' joint employer for purposes of their overtime pay claims. Runnels's interaction with County Administrator Cawley towards the end of her employment at the SAO might suggest that this control extended to the times relevant to Plaintiffs' claims. Cawley admitted that he rerouted Runnels's telephone line to another SAO employee and ordered a search of her computer's hard drive. Cawley believed that, as County Administrator, he had the right to do what he did without permission from anyone at the SAO. According to Runnels, he told her that he contemplated firing her as "not in good standing with the *County.*" Additionally, Cawley refused to allow Greenleaf to implement changes to the weekly schedules of SAO staff. Accordingly, a fact-finder could infer that the County was a joint employer of Plaintiffs, considering the FLSA's expansive definition of "employer."

## VII.

The Circuit Court alternatively awarded summary judgment to the County on the overtime pay claims on the basis that, even if it was Plaintiffs' joint employer, it did not know of and, therefore, is not liable for Plaintiffs' overtime work. The Court of Special Appeals reversed, holding that a trier of fact reasonably could conclude that the County had actual or constructive knowledge of Plaintiffs' overtime work.

*Runnels,* 179 Md.App. at 233, 944 A.2d at 1221. We affirm the intermediate appellate court.

The FLSA defines the verb "employ" to mean "to suffer or permit to work." 29 U.S.C.A. § 203(g) (1998). The Supreme Court has interpreted the "striking breadth" of this definition to be more expansive than "traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Brickey,* 944 F.Supp. at 1315. To hold an employer or, in this case, a potential joint employer liable for overtime wages, an employee must prove that the employer had actual or constructive knowledge of the overtime work. *Bailey v. County of Georgetown,* 94 F.3d 152, 157 (4th Cir. 1996). An employer's knowledge of "isolated incidents" of overtime work by an employee, however, is not sufficient to demonstrate actual or constructive knowledge of overtime work by the employee beyond those specific incidents. *Id.; Pforr v. Food Lion, Inc.,* 851 F.2d 106, 109 (4th Cir.1988). Thus, an employee "must show by actual knowledge or by a pattern and/or practice that the employer 'suffered' or allowed the [overtime] work claimed." *Pforr,* 851 F.2d at 109.

The County argues that the state of the facts adduced demonstrate that it did not know of Plaintiffs' overtime work. The County bolsters its argument by pointing out that its accounting and billing personnel never received the "comp sheets" on which the SAO staff, including Plaintiffs, recorded their overtime. The County's contention may be correct. While the County could not have been expected to know of every hour of overtime work in the SAO, Plaintiffs put forth evidence of a pattern of overtime work sufficient to permit a fair inference that the County may have known of the practice. Former State's Attorneys Jensen and Greenleaf volunteered that they repeatedly asked the County to budget for additional overtime for the SAO staff. Additionally, the County, allegedly, was aware of the SAO's increasing caseload. According to Greenleaf, he implemented the "time for time" compensatory time system following an incident in which County Administra-

tor Cawley approved overtime pay for Cooper, but later changed his mind and asked for the County's money to be returned. Cooper stated that she discussed the SAO's comp-time policy with someone in the County's accounting and billing office and that she used some of her comp-time when she was on maternity leave. Runnels stated that she discussed, with the County, cashing-out her comp-time before her last day of employment with the SAO. According to her, the County informed her that her comp-time was "use or lose," and the individual with whom she spoke did not seem surprised at the amount of comp-time that she had accumulated. Accordingly, a trier of fact reasonably could conclude that the County had constructive knowledge, at least, of a pattern of improperly compensated overtime work by the SAO staff generally and by Plaintiffs specifically.

## Conclusion

For the reasons stated, we affirm in part and reverse in part the judgment of the Court of Special Appeals (COSA). For ease of reference, the following grid summarizes the effect of our judgment in terms of the counts in Plaintiffs' complaint.

| | Circuit Court | COSA | COA |
|---|---|---|---|
| Count I (First Amendment) | Summary Judgment in favor of Newell and County (Count I not asserted against State) | Reverse as to Newell; Affirm as to County | Affirm CQSA as to Newell (Certiorari not sought as to County) |
| Count II (Article 40) | Summary Judgment for all Defendants | Reverse as to State Defendants; Affirm as to County | Affirm COSA as to State Defendants (Certiorari not sought as to County) |
| Count III (abusive discharge) | Summary Judgment for all Defendants | Affirm | Reverse COSA as to State Defendants (Certiorari not sought as to County) |
| Counts IV - VI (FLSA & MWHL) | Summary Judgment for State and County (Counts IV - VI not asserted against Newell) | Reverse as to County (No appeal as to State) | Affirm COSA |

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE IN PART AND AFFIRM IN PART THE JUDGMENT OF THE CIRCUIT COURT, CONSISTENT WITH THIS OPINION, AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED AS FOLLOWS–THIRTY PERCENT TO BE PAID BY CAROLINE COUNTY, AND SEVENTY PERCENT TO BE DIVIDED EQUALLY BETWEEN NEWELL AND THE STATE OF MARYLAND.